## GROPPI *v.* LESLIE, SHERIFF

No. 70–112. Argued November 10, 1971—Decided January 13, 1972

*William M. Coffey* argued the cause for petitioner. With him on the brief were *Robert J. Lerner, John D. Murray,* and *Steven H. Steinglass.*

*Sverre O. Tinglum,* Assistant Attorney General of Wisconsin, argued the cause for respondent. With him on the brief was *Robert W. Warren,* Attorney General.

*Melvin L. Wulf, Sanford J. Rosen,* and *Robert H. Friebert* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted the writ of certiorari to review the holding of the Court of Appeals for the Seventh Circuit, denying petitioner relief in habeas corpus proceedings after the District Court had granted relief.

On October 1, 1969, the Assembly of the Wisconsin Legislature passed a resolution citing petitioner for contempt and directing his confinement in the Dane County

jail for a period of six months or for the duration of the 1969 Regular Session of the legislature, whichever was shorter. The resolution recited that petitioner had, two days previously, led a gathering of people which, by its presence on the floor of the Assembly during a regular meeting in violation of an Assembly Rule, "prevented the Assembly from conducting public business and performing its constitutional duty." The resolution contained a finding that petitioner's actions constituted "disorderly conduct in the immediate view of the house and directly tending to interrupt its proceedings" which the Assembly was authorized to punish under the State Constitution and statutes.[1]

---

[1] The text of the October 1 resolution was as follows:

"1969 Spec. Sess. ASSEMBLY RESOLUTION

"Citing James E. Groppi for contempt of the Assembly and directing his commitment to the Dane county jail.

"In that James E. Groppi led a gathering of people on September 29, 1969, which by its presence on the floor of the Assembly during a meeting of the 1969 regular session of the Wisconsin Legislature in violation of Assembly Rule 10 prevented the Assembly from conducting public business and performing its constitutional duty; now, therefore, be it

"Resolved by the Assembly, That the Assembly finds that the above-cited action by James E. Groppi constituted "disorderly conduct in the immediate view of the house and directly tending to interrupt its proceedings" and is an offense punishable as a contempt under Section 13.26 (1) (b) of the Wisconsin Statutes and Article IV, Section 8 of the Wisconsin Constitution and therefore:

"(1) Finds James E. Groppi guilty of contempt of the Assembly; and

"(2) In accordance with Section 13.26 and 13.27 of the Wisconsin Statutes, orders the imprisonment of James E. Groppi for a period of 6 months, or for the duration of the 1969 regular session, whichever is briefer, in the Dane county jail and directs the sheriff of Dane county to seize said person and deliver him to the jailer of the Dane county jail; and, be it further

"Resolved, That the Assembly directs that a copy of this resolution be transmitted to the Dane county district attorney for further

The record before us contains little to flesh out the recitations of the contempt resolution with the details of petitioner's conduct on the day of September 29, 1969. The Wisconsin Supreme Court, in its opinion denying petitioner's application for habeas corpus, took judicial notice that petitioner's conduct was designed to protest cuts in the state budget for certain welfare programs, and that the "occupation" of the Assembly chamber by petitioner and his supporters continued from midday to "well toward midnight," during all of which time the Assembly was prevented from conducting its lawful business.[2]

The contempt resolution was adopted without giving notice to petitioner or affording him an opportunity to present a defense or information in mitigation. A copy of the resolution was then served on petitioner who, at the time the resolution was passed, was already confined in the Dane County jail following his arrest on disorderly conduct charges arising out of the same incident as that

---

action by him under Section 13.27 (2) of the Wisconsin Statutes; and, be it further

"Resolved, That the attorney general is respectfully requested to represent the Assembly in any litigation arising herefrom."

Article IV, § 8, Wisconsin Constitution provides in part:

"Each house may determine the rules of its own proceedings, punish for contempt and disorderly behavior . . . ."

Section 13.26, Wis. Stat. (1967), provides in part:

"(1) Each house may punish as a contempt, by imprisonment, a breach of its privileges or the privileges of its members . . . for . . .

.      .      .      .      .

"(b) Disorderly conduct in the immediate view of the house and directly tending to interrupt its proceedings.

.      .      .      .      .

"(2) The term of imprisonment a house may impose under this section shall not extend beyond the same session of the legislature."

[2] On oral argument, counsel for petitioner conceded these facts. The paucity of the record may be attributed to the fact that the District Court acted on the pleadings without an evidentiary hearing.

underlying the resolution.[3] Petitioner's confinement after he was served with the resolution was pursuant to its authority.

Petitioner then commenced actions in both state and federal courts contending that his confinement violated his constitutional rights, and seeking his release. Petitioner's applications for habeas corpus were denied by the Circuit Court for Dane County and the Wisconsin Supreme Court. However, after the state courts had acted, the United States District Court for the Western District of Wisconsin granted petitioner's federal habeas application. The District Court was of the view that petitioner had been denied due process of law guaranteed by the Fourteenth Amendment by the failure of the Assembly to accord him "some minimal opportunity to appear and to respond to a charge" prior to the imposition of punishment for contempt. On appeal, the Court of Appeals reversed the holding of the District Court; the holding of the panel was adopted by a narrowly divided court on rehearing *en banc.* We granted certiorari. For the reasons stated herein, we conclude that petitioner was denied due process of law by the procedures employed in punishing him for contempt, and we reverse the judgment of the Court of Appeals.

## I

The past decisions of this Court expressly recognizing the power of the Houses of the Congress to punish contemptuous conduct leave little question that the Constitution imposes no general barriers to the legislative exercise of such power. *E. g., Jurney* v. *MacCracken,* 294 U. S. 125 (1935); *Anderson* v. *Dunn,* 6 Wheat. 204 (1821). There is nothing in the Constitution

---

[3] Tr. of Oral Arg. 4, 27. Petitioner was subsequently tried in County Court on the disorderly conduct charge. He was discharged by the court after the jury was unable to reach a verdict.

that would place greater restrictions on the States than on the Federal Government in this regard. See *Kilbourn* v. *Thompson,* 103 U. S. 168, 199 (1881). We are therefore concerned only with the procedures that the Due Process Clause of the Federal Constitution requires a state legislature to meet in imposing punishment for contemptuous conduct committed in its presence.

This Court has often recognized that the requirements of due process cannot be ascertained through mechanical application of a formula. See, *e. g., Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 894–895 (1961); *Hannah* v. *Larche,* 363 U. S. 420 (1960). Mr. Justice Frankfurter, in another context, aptly stated that due process "is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. . . ." *Joint Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 162–163 (1951) (concurring opinion). Courts must be sensitive to the nature of a legislative contempt proceeding and the "possible burden on that proceeding" that a given procedure might entail. *Hannah* v. *Larche,* 363 U. S., at 442. Legislatures are not constituted to conduct full-scale trials or quasi-judicial proceedings and we should not demand that they do so although they possess inherent power to protect their own processes and existence by way of contempt proceedings. For this reason, the Congress of the United States, for example, no longer undertakes to exercise its contempt powers in all cases but elects to delegate that function to federal courts. 52 Stat. 942, 2 U. S. C. §§ 192–194.

The potential for disrupting or immobilizing the vital legislative processes of State and Federal Governments that would flow from a rule requiring a full-blown legislative "trial" prior to the imposition of punishment for contempt of the legislature is a factor entitled to very great weight; this is particularly true where the con-

temptuous conduct, as here, is committed directly in the presence of the legislative body. The past decisions of this Court strongly indicate that the panoply of procedural rights that are accorded a defendant in a criminal trial has never been thought necessary in legislative contempt proceedings. The customary practice in Congress has been to provide the contemnor with an opportunity to appear before the bar of the House, or before a committee, and give answer to the misconduct charged against him. See *Jurney* v. *MacCracken,* 294 U. S., at 143–144; *Kilbourn* v. *Thompson,* 103 U. S., at 173, 174; *Anderson* v. *Dunn,* 6 Wheat., at 209–211; *Marshall* v. *Gordon,* 243 U. S. 521, 532 (1917).[4] Such would appear to have been the general practice in colonial times, and in the early state legislatures.[5] This practice more nearly resembles the traditional right of a criminal defendant to allocution prior to the imposition of sentence than it does a criminal prosecution. See *Green* v. *United States,* 365 U. S. 301 (1961).

---

[4] See generally 2 A. Hinds, Precedents of the House of Representatives, cc. 51, 52; E. Eberling, Congressional Investigations: A Study of the Origin and Development of the Power of Congress to Investigate and Punish for Contempt (1928).

Hinds discusses an assault by one reporter on another on the floor of the House on June 11, 1836. The House did not proceed immediately to hold the party in contempt, but appointed a select committee to investigate the matter. The contemnor appeared before the committee and admitted his offense. Before it acted on the report of the committee by passing a contempt resolution, the House brought the contemnor before the Bar of the House. Hinds, *supra,* at § 1630. Hinds also discusses numerous instances of "direct" contempts committed by members of the House in which the contemnor was afforded an opportunity to speak in his behalf. See §§ 1642–1643, 1647, 1648, 1650–1653, 1657, 1665.

[5] See M. Clarke, Parliamentary Privilege in the American Colonies 103–105, 109–111 and n. 47, 112–113 (1943); Potts, Power of Legislative Bodies to Punish for Contempt, 74 U. Pa. L. Rev. 691, 704–705, 707, 711–712, 716, 718, 719–722, 724–725 (1926).

## II

In this case, however, there is no occasion to define or delineate precisely what process is due and must be accorded to a contemnor prior to the legislative imposition of punishment for contemptuous conduct. Here, the Wisconsin Assembly, two days after the conduct had occurred, found petitioner in contempt and sentenced him to confinement without giving him notice of any kind or opportunity to answer. There is no question of his having fled or become otherwise unavailable for, as we have noted, he was confined in the county jail at the time, and could easily have been given notice, if indeed not compelled, to appear before the Assembly. We find little in our past decisions that would shed light on the precise problem, but nothing to give warrant to the summary procedure employed here, coming as it did two days after the contempt. Indeed, we have stated time and again that reasonable notice of a charge and an opportunity to be heard in defense before punishment is imposed are "basic in our system of jurisprudence." *In re Oliver,* 333 U. S. 257, 273 (1948). See, *e. g., Joint Anti-Fascist Committee* v. *McGrath,* 341 U. S., at 143, 164–165, 171–172, 178, 185 (concurring opinions of Black, Frankfurter, Douglas, and Jackson, JJ.); *Cole* v. *Arkansas,* 333 U. S. 196, 201 (1948). We have emphasized this fundamental principle where rights of less standing than personal liberty were at stake. *E. g., Sniadach* v. *Family Finance Corp.,* 395 U. S. 337 (1969); *Morgan* v. *United States,* 304 U. S. 1, 18 (1938); *Grannis* v. *Ordean,* 234 U. S. 385, 394 (1914). In *Mullane* v. *Central Hanover Trust Co.,* 339 U. S. 306 (1950), the Court stated:

"Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they

require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." 339 U. S., at 313.

Although this language was addressed to *judicial* adjudication, historical practice would indicate that legislatures themselves have recognized the value of prior notice and hearing in cases of legislative contempt.

In exercise of the right to be heard, however briefly—the length and nature of which would traditionally be left largely to the legislative body—the putative contemnor might establish, for example, that it was a case of mistaken identity, or, also by way of affirmative defense, that he was mentally incompetent.[6] Other matters in explanation or mitigation might lessen the harshness of the legislative judgment or avoid punishment altogether.

### III

Wisconsin, however, argues that the power of a legislature to summarily punish for contempts committed in its immediate presence follows logically from the recognized power of courts in that respect. *E. g., Ex parte Terry*, 128 U. S. 289 (1888). Even if it be assumed that courts and legislatures are fully analogous in this respect, the recorded cases dealing with the power of a court to impose summary punishment for contempt committed in its immediate presence show that such power has not ordinarily been exercised under conditions such as those here, with a lapse of two days following the event and without notice or opportunity for hearing of any kind. A legislature, like a court, must, of necessity, possess the power to act "immediately" and "instantly"

---

[6] In the latter case, a legislative body, like a court, might direct a psychiatric examination. It can be assumed that one so disoriented as not to appreciate the nature of his acts would not be punished for contemptuous conduct.

to quell disorders in the chamber if it is to be able to maintain its authority and continue with the proper dispatch of its business. *In re Oliver,* 333 U. S., at 274–275; *Ex parte Terry,* 128 U. S., at 308, 310; *Johnson* v. *Mississippi,* 403 U. S. 212, 214 (1971); *Mayberry* v. *Pennsylvania,* 400 U. S. 455, 463 (1971). Where, however, the contemptuous episode has occurred two days previously, it is much more difficult to argue that action without notice or hearing of any kind is necessary to preserve order and enable a legislative body to proceed with its business.

The function of the contempt process by a legislative body is perhaps more related to deterrence of those disposed to create disorders than to restoring order. But the deterrence function can equally be served—perhaps even better—by giving notice and bringing the contemnor before the body and giving opportunity to be heard before being declared in contempt and sentenced.[7]

Where a court acts immediately to punish for contemptuous conduct committed under its eye, the contemnor is present, of course. There is then no question of identity, nor is hearing in a formal sense necessary because the judge has personally seen the offense and is acting on the basis of his own observations.[8] Moreover, in such a situation, the contemnor has normally been given an opportunity to speak in his own behalf in the nature of a right of allocution. See *Levine* v. *United*

---

[7] Under circumstances such as those in this case, neither a court nor a legislative body has any obligation to afford a contemnor a forum to expound his political, economic, or social views; but this does not mean that some brief period to present matter specifically in defense, extenuation, or mitigation is not required.

[8] The Court has been careful to limit strictly the exercise of the summary contempt power to cases in which it was clear that all of the elements of misconduct were personally observed by the judge. See *Johnson* v. *Mississippi,* 403 U. S. 212, 214–215 (1971); *In re Oliver,* 333 U. S. 257, 275–276 (1948).

*States,* 362 U. S. 610, 613–614 (1960); *Brown* v. *United States,* 359 U. S. 41, 52 (1959); *United States* v. *Sacher,* 182 F. 2d 416, 418 (CA2 1950), aff'd, 343 U. S. 1 (1952). Even in those circumstances, as we have noted, the conduct and utterance might be found excusable by a legislature or a court should it develop that the contemnor was suffering from some mental disorder rendering him unable to conform his conduct to requirements of the law and conventional behavior. Where, however, a legislative body acts two days after the event, in the absence of the contemnor, and without notice to him, there is no assurance that the members of the legislature are acting, as a judge does in a contempt case, on the basis of personal observation and identification of the contemnor engaging in the conduct charged, nor is there any opportunity whatsoever for him to speak in defense or mitigation, if he is in fact the offender.

*Ex parte Terry, supra,* does not control this case. There the circuit court acted promptly after the contemnor—who was a lawyer—had voluntarily absented himself from the courtroom and while he was present in an adjacent room of the court building. This Court concluded that the contemnor could not defeat the jurisdiction of the circuit court to act as soon as reasonably possible to punish the contempt by his voluntary departure from the courtroom. 128 U. S., at 310–311. The Court reasoned that

> "The departure of the petitioner from the courtroom to another room, near by, in the same building, was his voluntary act. And his departure, without making some apology for, or explanation of, his conduct, might justly be held to aggravate his offence, and to make it plain that, consistently with the public interests, there should be no delay, upon the part of the court, in exerting its power to punish." *Id.,* at 311.

Dealing only with the narrow circumstances present in *Terry*, the Court expressly reserved the question whether the circuit court would have had the power to proceed on a subsequent day without according the contemnor an opportunity to be heard. *Id.*, at 314. By way of contrast, the resolution in this case was, as we have noted, adopted two days after the event and while petitioner was being detained in the county jail in the same city, and hence available to be served with notice. In *Sacher* v. *United States*, 343 U. S. 1 (1952), the Court approved the trial judge's action in waiting until the end of a nine-month trial to summarily hold defense counsel[9] in contempt for breaches committed during the trial. However, the Court was careful to observe that an immediate holding of contempt during the trial might have prejudiced the defendants in the eyes of the jury or otherwise impeded their advocacy. Moreover, the contemnors were present throughout the course of the trial, were repeatedly warned by the trial judge that their conduct was contemptuous, were advised that they could be called to account later,[10] and were given an opportunity to speak.[11]

At a very early stage in our history this Court stated that the legislative contempt power should be limited to "[t]he least possible power adequate to the end proposed." *Anderson* v. *Dunn*, 6 Wheat., at 231; *In re Oliver*, 333 U. S., at 274. While a different result

---

[9] One of the contemnors was a layman who had acted as his own lawyer.

[10] 182 F. 2d, at 428.

[11] *Id.*, at 418. Although he imposed sentence before hearing the contemnors, the trial judge would, no doubt have modified his action had their statements proved persuasive. See *United States* v. *Galante*, 298 F. 2d 72, 76 (CA2 1962) (Friendly, J., concurring and dissenting). Modification of contempt penalties is common where the contemnor apologizes or presents matter in mitigation.

might well follow had the Wisconsin Assembly acted immediately upon occurrence of the contemptuous conduct and while the contemnor was in the chamber,[12] or nearby within the Capitol building, as in *Terry,* we conclude that the procedures employed in this case were beyond the legitimate scope of that power because of the absence of notice or any opportunity to respond. The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

---

[12] The present practice of Parliament is described in E. May, The Law, Privileges, Proceedings and Usage of Parliament (17th ed. 1964) as follows:

"When the contempt is committed in the actual view of either House, as, for example, where a witness prevaricates, gives false evidence or refuses to answer, the House proceeds *at once,* without hearing the offender, *unless by way of apology or to manifest his contrition,* to punish him for his contempt." *Id.,* at 133 (emphasis added).