IN THE MATTER OF: THE IMPRISONMENT OF EUGENE EDISON

No. 7227SC520

(Filed 2 August 1972)

**1. Contempt of Court § 2— direct and indirect contempt**

A direct contempt of court consists of words spoken or acts committed in the actual or constructive presence of the court while it is in session or during recess which tend to subvert or prevent justice; an indirect contempt is one committed outside the presence of the court, usually at a distance from it, which tends to degrade the court or interrupt, prevent or impede the administration of justice.

**2. Contempt of Court §§ 2, 3— civil and criminal contempt**

Acts or omissions which ordinarily constitute criminal contempt are designated by G.S. 5-1 as punishable "for contempt," and acts or omissions which ordinarily constitute civil contempt are designated by G.S. 5-8 as punishable "as for contempt."

**3. Contempt of Court § 5— necessity for notice and hearing**

Notice and hearing were required in order for the court to hold a person in contempt for perjury committed in a bond forfeiture hearing held three weeks previously.

ON *certiorari* from the order of *Harry C. Martin, Judge,* entered at the 18 April 1972 Session of GASTON Superior Court.

On 3 May 1972 this court granted certiorari to review an order of Harry C. Martin, Judge, denying the petition of Eugene Edison (Edison) for a writ of habeas corpus to discharge him from custody pursuant to an order of Kirby, District Judge, adjudging Edison in contempt of court.

The record discloses the following uncontradicted facts: On 27 September 1971 three arrest warrants were issued in Gaston District Court charging Barbara J. Bond with three separate offenses of shoplifting on said date. On the same day an appearance bond in amount of $500 was executed by Barbara Jean Bond as principal and Ernest M. Dow and Freddie Dow as sureties requiring Barbara J. Bond to appear before the district court in Gastonia at 9:00 a.m. on 13 October 1971 to answer three counts of larceny. Annie Bell Davis signed the "justification of surety" along with Ernest and Freddie Dow. On 13 October 1971 judgment *nisi* was entered on the bond, a writ of *scire facias* was issued, and a capias instanter was issued for the arrest of Barbara J. Bond. On 15 October 1971 the capias was returned unserved with notation that defendant

could not be found in Gaston County. On 15 October 1971 the sci. fa. was returned served on Ernest Dow but unserved as to Barbara Bond. Ernest Dow filed an answer to the sci. fa. and on 21 March 1972 Kirby, D.J., entered judgment absolute on the bond in amount of $350.00.

On 17 April 1972 affidavits on Betty Jean Davis (Betty) and Annie Bell Davis (Annie), bearing date of 17 April 1972, were filed, and pertinent portions of the affidavits are summarized as follows: Betty was arrested in Gastonia on 27 September 1971 on charges of shoplifting but told arresting officers her name was Barbara J. Bond. She was taken to the courthouse and there saw Ray Smith whom she knew, Smith being an employee of Dow Bonding Company (Dow). Smith told Betty that he knew her and her parents and that Dow would make her bond. Betty went with Smith to Dow's office and her mother was called to come to the office. Two other girls were arrested at the same time Betty was arrested, they gave fictitious names, and were at Dow's office at the same time Betty was there. When Annie arrived, "Flip" Dow, who knew Betty and Annie and knew Betty's correct name, was paid $45.00 on the $75.00 bond premium and the bond was made. On 7 October 1971 Betty and Annie went to Dow's office and talked with Ernest Dow, the father of the other two Dows in the bonding company. Ernest Dow told Betty and Annie if they would pay him $502.00 that he would take care of the case. The $502.00 was obtained and paid to Dow. Ernest Dow told Betty she need not go to court and "not to be uptown getting into any trouble and to stay away from town for awhile . . . ." On 8 October 1971 Betty and Annie went to Dow's office and paid the $30.00 balance of the bond premium. All of the members of Dow had known Annie and her husband for many years and had been to her home. Betty and Annie heard nothing more about the case until sometime later when Captain Elmore of the Gastonia Police Department went to Annie's home, inquired about Betty and stated that the case against Betty was still pending.

On 17 April 1972 Kirby, D.J., entered an order stating that on 21 March 1972 he remitted $150.00 of a $500.00 bond posted in the case of *State v. Barbara J. Bond;* that said action was taken following the introduction of sworn testimony given on said date; that from sworn statements of Betty Jean Davis, alias Barbara J. Bond, and her mother, Annie Bell Davis, the court concluded that the order of 21 March remitting a portion

of the bond should be set aside because of fraud and perjured testimony given to the court. He ordered that the surety pay the balance of $150.00.

On 17 April 1972 Kirby, D.J., entered an order commanding the Sheriff of Gaston County to forthwith bring before him Gene Edison, Ernest M. Dow, Freddie Dow, and Howard Clinton "for such orders as will appear at the time of their appearance."

On 17 April 1972 Kirby, D.J., entered the following order:

"This matter coming on to be heard, and being heard before the undersigned Judge of the District Court of Gaston County, North Carolina, and the Court finding the following facts:

"That on the 21st day of March, 1972, Gene Edison, an employee of Dow Bonding Company, offered sworn testimony in the captioned matters that he and other representatives of Dow Bonding Company had made an extensive search for Barbara Bond; that no such person existed and that in fact Barbara Bond was an alias or fictitious name and that despite extensive efforts, they were unable to locate her; that the Court in the exercise of its discretion entered an Order remitting $150.00 of the $500.00 bond in consideration of all the facts and the alleged efforts to locate the defendant;

"That in fact the said Barbara Bond was known personally to the members of the Dow Bonding Company and had not only paid the premium for the bond in the sum of $75.00, but also had paid into the office of Dow Bonding Company the sum of $502.00, which amount was paid upon representations by Ernest M. Dow that her case would be 'taken care of' as appears in Affidavits executed this date by Betty Jean Davis, Annie Bell Davis, and Edgar Rhyne, which are attached hereto, and by reference incorporated herein;

"That the said Gene Edison by virtue of sworn testimony which was false, untrue and perjured, and offered for the purpose of obtaining unwarranted relief upon a bond forfeiture, has committed contemptuous conduct in the presence of the Court which conduct was intended to

impair the respect due the Court's authority, and for the purpose of interrupting the Court's proceedings, and impeding justice; and for such contemptuous conduct the Court hereby sentences the said Gene Edison to be imprisoned in the County Jail of Gaston County for thirty (30) days, as by law provided.

"This 17th day of April, 1972.

ROBERT KIRBY
District Court Judge"

The proceedings before Kirby, D.J., on 17 April 1972 when Edison and the others summoned appeared are summarized as follows: The court stated that what he had been told on 21 March was untrue. He had caused an investigation to be made and sworn affidavits from Betty Jean Davis and her mother had been obtained and he read the affidavits. The court then stated: "Now, gentlemen, I always try to shoot square with everybody. She's taking down everything that is said. I wouldn't say anything, gentlemen, not a word. Now, Mr. Edison, you are the one who took the witness stand, and I don't have any alternative but to enter the following Order."

Following the entry of the above quoted order of Kirby, D.J., Edison applied to Superior Court Judge Harry C. Martin for a writ of habeas corpus. On 18 April 1972 Judge Martin entered an order summarized as follows: The facts found in the order of the district court judge of April 17, 1972 are binding upon the superior court. The facts found in the district court order constitute contempt of court under G.S. 5-1 and 6 and are sufficient to support the sentence imposed. The judgment was within the jurisdiction of the district court which acted within its lawful authority. The petition that Edison be discharged from custody is denied.

Judge Martin entered an order allowing Edison bond pending his petition to the Appellate Division for certiorari.

*Attorney General Robert Morgan by Assistant Attorney General Russell G. Walker, Jr., for the State.*

*Hollowell, Stott & Hollowell, Frank P. Cooke and Steve B. Dolley, Jr., by Grady B. Stott for petitioner appellant.*

BRITT, Judge.

Edison assigns as error (1) the entry by the district court of its order of 17 April 1972 committing Edison to jail for contempt and (2) the failure of Judge Martin to vacate the order and grant Edison's petition for habeas corpus. Our writ of certiorari brings the entire matter before us for review.

The first question for consideration is whether the district court followed the proper procedure in adjudging Edison in contempt. We hold that it did not.

[1] If the facts found by the district court constitute contempt of court under G.S. 5-1, it is not a direct contempt, therefore, the procedure for indirect contempt must be followed including an order to show cause. The law concerning contempt in North Carolina can become somewhat confusing. Contempts of court are classified in two main divisions known as direct and indirect contempt. A direct contempt consists of words spoken or acts committed in the actual or constructive presence of the court while it is in session or during recess which tend to subvert or prevent justice. *Galyon v. Stutts*, 241 N.C. 120, 84 S.E. 2d 822 (1954). An indirect contempt is one committed outside the presence of the court, usually at a distance from it, which tends to degrade the court or interrupt, prevent, or impede the administration of justice. *Galyon v. Stutts, supra*.

[2] Proceedings for contempt are further classified as criminal and civil. In *Galyon* the court said: "With us contempts are defined and classified generally by two statutes: G.S. 5-1 and G.S. 5-8. These statutes recognize and preserve the fundamental distinction between civil and criminal contempt in substance but not in name. Acts or omissions which ordinarily constitute criminal contempt as defined in the textbooks are designated by our statute (G.S. 5-1) as punishable 'for contempt,' without further designation; the acts or omissions which ordinarily constitute civil contempt as defined in the books are designated by our statute (G.S. 5-8) as punishable 'as for contempt.' Thus, under our statutes the proceedings for criminal and civil contempt are 'for contempt' and 'as for contempt,' respectively." G.S. 5-1(6) provides punishment "for contempt" upon "(T)he contumacious and unlawful refusal of any person to be sworn as a witness, or, when so sworn, the like refusal to answer any legal and proper interrogatory."

G.S. 5-8(4) provides for punishment "as for contempt" "(a)ll persons summoned as witnesses in refusing or neglecting to obey such summons to attend, be sworn, or answer, as such witness."

The court goes on in *Galyon* to say: "(I)t is thus noted, from the tenor of the latter two statutes, that the refusal of a witness to testify at all or to answer any legal or proper question is made punishable both 'as contempt' and 'as for contempt.' And since the power of the court over a witness in requiring proper responses is inherent and necessary for the furtherance of justice, it must be conceded that testimony which is *obviously false* or evasive is equivalent to a refusal to testify within the intent and meaning of the foregoing statutes, and therefore punishable 'as contempt' or 'as for contempt,' depending upon the facts of the particular case." (Emphasis added.)

Since giving "obviously false" testimony can be punishable by contempt civilly or criminally our concern here is whether the contempt, if any, was direct or indirect, without attempting to equate direct or indirect contempt with civil or criminal contempt. We distinguish the facts of this case from direct contempt in that all the facts necessary to establish the false testimony were not before the court, therefore, it is impossible to say that there were words spoken or acts committed in the actual presence of the court which would constitute direct contempt. "(W)hen the conduct complained of was before a commissioner or other subordinate officer of the court and *the court has no direct knowledge of the facts constituting the alleged contempt,* in order for the court to take original cognizance thereof and determine the question of contempt, the proceedings must follow the procedural requirements as prescribed for indirect contempt . . . and be based on rule to show cause or other process constituting an initiatory accusation meeting the requirements of due process as prescribed by our statutes." (Emphasis added.) *Galyon v. Stutts, supra.*

Assuming, *arguendo,* that the conduct in question would amount to direct contempt the recent case of *Groppi v. Leslie,* 404 U.S. 496, 30 L.Ed. 2d 632, 92 S.Ct. 582 (1972) would indicate that regardless of what kind of contempt was involved that under the facts in this case notice and a hearing would be required as is the practice in our state when an order to show cause is issued in an indirect contempt. In *Groppi,* the

Wisconsin legislature cited the petitioner for contempt for conduct on the floor of the State Assembly that occurred two days previous to the contempt resolution. This procedure was held to violate petitioner's due process since he was readily available, but was given no notice before the resolution was adopted or afforded any opportunity to respond by way of defense or extenuation.

Quoting from *Groppi* at 30 L.Ed. 2d 639, we find:

> A legislature, like a court, must, of necessity, possess the power to act "immediately" and "instantly" to quell disorders in the chamber if it is to be able to maintain its authority and continue with the proper dispatch of its business. (Citations.) Where, however, the contemptuous episode has occurred two days previously, it is much more difficult to argue that action without notice or hearing of any kind is necessary to preserve order and enable a legislative body to proceed with its business.

*    *    *    *    *    *

> Where a court acts immediately to punish for contemptuous conduct committed under its eye, the contemnor is present of course. There is then no question of identity, nor is hearing in a formal sense necessary *because the judge has personally seen the offense and is acting on the basis of his own observations.* (Emphasis added.) Moreover, in such a situation, the contemnor has normally been given an opportunity to speak in his own behalf in the nature of a right of allocution. (Citations.) . . . . Where, however, a legislative body acts two days after the event, in the absence of the contemnor, and without notice to him, there is no assurance that the members of the legislature are acting, as a judge does in a contempt case, on the basis of personal observation and identification of the contemnor engaging in the conduct charged, nor is there any opportunity whatsoever for him to speak in defense or mitigation, if he is in fact the offender.

In the case of *Ex Parte Savin,* 131 U.S. 267, 33 L.Ed. 150, 153, 9 S.Ct. 699 (1888) the U. S. Supreme Court said:

> Where the contempt is committed directly under the eye or within the view of the court, it may proceed "upon its own knowledge of the facts, and punish the offender,

In re Edison

without further proof, and without issue or trial in any form" (EX PARTE TERRY, 128 U.S. 289, 309) [32:405, 410]; whereas, in cases of misbehavior of which the judge cannot have such personal knowledge, and is informed thereof only by the confession of the party, or by the testimony under oath of others, the proper practice is, by rule or other process, to require the offender to appear and show cause why he should not be punished. 4 Bl. Com. 286.

[3] We hold that the facts in the case at bar, where more than three full weeks elapsed between the conduct charged and the sentencing for contempt, fall sufficiently within the facts in *Groppi* to render the giving of notice and a hearing to Edison imperative.

The next question that arises is whether the alleged conduct of Edison constitutes contempt of court. In 17 Am. Jur. 2d, Contempt, § 33, p. 38, it is said: "Making a false statement under oath may constitute contempt, notwithstanding that the conduct may also be a crime, such as perjury or false swearing." In *Galyon v. Stutts, supra,* the court indicated that the giving of testimony which is "obviously false" can constitute contempt. However, since we are invalidating the contempt order on procedural grounds, and due to the limited record before us, we do not pass upon this question.

The alleged conduct of Edison and his associates if true was reprehensible and appropriate action should be taken against those implicated in practicing a fraud on the courts. Nevertheless, those guilty or accused of the most reprehensible conduct are entitled to due process and on the record before us we hold that due process requires that Edison have his day in court.

For the reasons stated we declare invalid the order of the district court adjudging Edison in contempt and reverse the order of Judge Martin denying Edison's petition for habeas corpus.

Reversed.

Chief Judge MALLARD and Judge CAMPBELL concur.