**UNITED STATES of America and Samuel James Baker, Special Agent, Internal Revenue Service, Plaintiffs-Appellees,**

v.

**A. Burton HANKINS, Defendant,**

**Hugh C. Montgomery, Jr., Defendant-Appellant.**

**No. 79–1015.**

United States Court of Appeals, Fifth Circuit.

Aug. 21, 1980.

Charles L. Brocato, Jackson, Miss., for defendant-appellant.

James B. Persons, Biloxi, Miss., amicus curiae, for Mississippi State Bar.

Terry Philip Segal, Boston, Mass., amicus curiae, for American Bar Association's Section on Taxation's Committee, etc.

Byrne A. Bowman, Oklahoma City, Okl., amicus curiae.

H. M. Ray, U. S. Atty., Thomas W. Dawson, Asst. U. S. Atty., Oxford, Miss., William A. Whitledge, Charles E. Brookhart, M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., for plaintiffs-appellees.

Before TUTTLE, RANDALL and TATE, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal by Hugh C. Montgomery, Jr., attorney for A. Burton Hankins, from a judgment holding Montgomery guilty of criminal and civil contempt resulting from his conduct as counsel for Hankins. To the usual complications inherent in dealing with the subject of each separate type of contempt judgment, this case is made more complicated from the fact that the single judgment entered by the trial court found Montgomery guilty of both kinds. Montgomery stands subject to a sentence to pay a fine of $250 for the criminal contempt and subject to commitment in the custody of the Attorney General until he complies with the orders of the court, and a penalty of $2,035.97 to compensate the Government for the expenses incurred in bringing the contempt proceeding for the civil contempt. Both judgments were stayed pending appeal.

We reverse both the criminal conviction and the conviction of civil contempt and the sanctions imposed thereunder.

Montgomery's problems commenced in February of 1974 when he was employed to represent Hankins with respect to his income tax matters under investigation for the years 1972 and 1973. In 1976, IRS Special Agent Grant served summons on Hankins, the taxpayer, his attorney, Montgomery, and others, calling for the production of documents and the testimony of the summoned parties. The district court entered an order on August 11, 1976, ordering the summonses enforced. All parties appealed to this Court and sought stays pending appeal. These stays were denied, whereupon Hankins appeared and produced some but not all of the records ordered

produced. On April 29, 1977, the district court held Hankins in contempt and ordered him incarcerated until such time as he complied with that court's order.

On December 9, 1976, Montgomery appeared before Special Agent Sykes in response to the August 11, 1976 order directing him to testify. In spite of the order, Montgomery refused to answer some of the questions propounded by Agent Sykes on the grounds of attorney/client privilege, attorney work product doctrine, and/or his assertion that the questions were not relevant to the income tax liability of Hankins. Thereupon the United States and Agent Grant filed a petition seeking to have Montgomery held in contempt for his failure to answer those questions. This hearing was held on April 29, 1977, at which time the district court ruled that the burden of establishing a claim of privilege rested with Montgomery. After calling Revenue Agent John Irving to testify, it was established that the Internal Revenue Service had determined deficiencies in the income tax liabilities of two of Hankins' corporations for the years 1972 and 1973 and in the income tax liability of Hankins in the amount of $438,803.09 for the year 1972. Montgomery then took the stand on his own behalf, and testified that he had been employed by Hankins in February 1974 to advise and consult with him about an examination of certain income tax returns of his that were under examination at that time, that he had had several conferences with Mr. Hankins which he considered to be confidential communications. He testified that at no time had Hankins waived the confidentiality of any communications. He testified that he had not prepared any income tax returns for Hankins, Lewis Smith, his accountant, or any connected partnership or corporation. He then testified, in response to questions asked by his counsel as follows:

Q: In the course of your employment with Mr. Hankins did you ever have occasion to examine books and records of Hankins Lumber Company and these related business entities?

A: Yes. I did.

Q: How did you determine which books and records to examine?

A: Well, as a general practice when you have an examination, an Internal Revenue Service examination, and you are counseling with your client, you look at whatever records you might think are pertinent.

Q: Were you directed to those records by Mr. Hankins?

A: I was.

Q: Was that as a result of a confidential communication?

A: It was.

Q: Did you consider the examination of these books and records essential to the legal advice which you would give to these gentlemen?

A: Yes, sir. I did.

Thereafter, Montgomery testified that when he had appeared before Special Agent Sykes and had been asked questions concerning certain books and records, none of those records were in his or his law firm's custody or control at the time of the service of a subpoena duces tecum in this proceeding.

The cross examination of Montgomery resulted in refusals to answer which formed the basis of his conviction for criminal contempt and for civil contempt as well. The cross examination went in this fashion:

Q: Mr. Montgomery, you testified on direct examination that you had had occasion to examine various books and records belonging to A. Burton Hankins. What books and records belonging to A. Burton Hankins do you examine?

MR. BROCATO (Counsel for Montgomery): Objection

THE COURT: The objection is overruled.

MR. BROCATO: Your Honor, at the risk of it being a problem, I am going to have to respectfully advise Mr. Montgomery not to answer the question.

THE COURT: Mr. Montgomery, I have to direct you to answer it.

THE WITNESS: Your Honor, on the advice of my attorney that I should not

answer this question, because of various privileges, I must respect his advice.

THE COURT: I find you in contempt of Court for failure to follow my instructions to answer the question. All right, proceed.

Q: When did you examine—when was the first time you examined the records of A. Burton Hankins?

MR. BROCATO: Your Honor, we have got to object for the same reasons.

THE COURT: The same ruling.

MR. BROCATE: I have to advise Mr. Montgomery not to answer the question.

THE COURT: Do you follow his advise?

THE WITNESS: Yes, sir, upon advice of counsel.

THE COURT: All right. I find him in contempt of court for failure to answer the question.

MR. WHITLEDGE (Counsel for the United States): With the Court's permission, Your Honor, although it appears that Mr. Montgomery is going to continue to refuse, for the record I would like to put in, and perhaps I can do it very briefly by asking Mr. Montgomery if I ask him the same questions appearing in the question and answer would he respond or would he fail to respond.

THE COURT: All right.

MR. BROCATO: I would have to advise him not to respond to counsel.

THE COURT: All right, you may ask him the question.

BY THE COURT:

Q: Do you refuse to answer the questions that are propounded to you by counsel?

A: On advice of counsel.

Q: On the advice of counsel?

A: On the advice of my counsel, for the reasons previously stated.

THE COURT: I must direct you to do so.

THE WITNESS: I understand, sir.

THE COURT: All right, you are in contempt of court.

MR. WHITLEDGE: Your Honor, at this point I believe we have reached an impasse.

THE COURT: Correct.

When government counsel stated that he would like to ask Mr. Montgomery the same questions appearing "in the question and answer," he was referring to the list of questions that had been put to Mr. Montgomery by Special Agent Sykes, and which Montgomery had refused to answer on December 9, 1976. Thus, the hearing on April 29, 1977, at which the foregoing proceedings were had, played two parts in the unfolding drama. It was the hearing resulting from the government's obtaining a show cause order as to why Montgomery should not be held in contempt of court for failing to answer the questions put by Sykes and it was also a hearing at which Montgomery, in the presence of the court itself, refused to answer some of the same questions that were then put to him for the second time.

■ The trial court concluded that the refusal of the witness to answer questions as ordered by the court warranted the court's adjudging him summarily guilty of criminal contempt by virtue of the provisions of the Federal Rules of Criminal Procedure. Rule 42(a) provides as follows:

## CRIMINAL CONTEMPT

(a) *Summary Disposition.* A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

Criminal contempts that do not fit the description of subdivision (a) may be disposed of only upon notice and hearing under subdivision (b) which provides:

The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts, constituting the criminal contempt charge and describe it as such.

Since it is clear here that no such notice was given before the adjudication by the trial court of criminal contempt, that judgment must be vacated unless it is authorized under Section 42(a). It was not until the end of the hearing on April 29, 1977, that anything was said with respect to sanctions to be applied to Mr. Montgomery for his contempt. Even then, the government seemed uncertain whether it was speaking of a criminal or a civil contempt in arguing its position to the court. Government counsel said:

And we would submit the court has held Mr. Montgomery in contempt and would ask the court to apply any sanctions it deems appropriate *to compel these answers.* [Emphasis added.]

Finally, it was only in the final order, dated December 15, 1978, that the district court made an express finding that "the Court finds Hugh C. Montgomery, Jr. in criminal contempt of Court, committed in the presence of the Court, and orders Hugh C. Montgomery, Jr. be fined the amount of $250.00."

Although the language of Rule 42(a) seems on its face to be adequate warrant for the court's action in the criminal contempt matter, the Supreme Court has cast serious doubts upon the use of this section to justify such a summary proceeding. *Groppi v. Leslie,* 404 U.S. 496, 92 S.Ct. 582, 30 L.Ed.2d 632 (1972); *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1973); *United States v. Wilson,* 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186. In *Groppi* and *Taylor,* the Court's effort was to indicate the cases that might be thought to have met the literal language of the section, but where the facts were not of a nature that warranted the Court's permitting the summary procedure to be used. In *Groppi,* the state legislature passed an act declaring *Groppi* in contempt of the legislature several days after the adjournment of the session. It was clear, as the Court pointed out, that it would not have impeded any action or proceedings of the state legislature for the requirements of subsection (b) to have been observed. In *Taylor,* the trial judge was outraged by nine specified actions by defense counsel, and immediately concluding the trial and the bringing in of the jury's verdict, the trial court, without giving Taylor an opportunity to respond, proceeded immediately to sentence him for the nine criminal contempts. The Court cited *Groppi* for the following proposition:

We have stated time and again that reasonable notice of a charge and an opportunity to be heard in defense before punishment is imposed are "basic in our system of jurisprudence."

418 U.S. 488 at 498, 94 S.Ct. 2697 at 2703, 41 L.Ed.2d 897.

The Supreme Court in the *Wilson* case rejected the idea that in order for a criminal contempt hearing to be justified under Rule 42(a), the contemnor's conduct must be either violent, or in some way threatens physically to disrupt the trial procedure. The formula announced in *Wilson* is distilled in the following words:

The face-to-face refusal to comply with the court's order itself constituted an affront to the court [footnote omitted] and when that kind of refusal *disrupts and frustrates an ongoing proceeding,* as it did here, summary contempt must be available to vindicate the authority of the Court as well as to provide the recalcitrant witness with some incentive to testify. *In re Chiles,* 22 Wall. 157, 168, 22 L.Ed. 819 (1875). [Emphasis added.]

*United States v. Wilson,* 421 U.S. 309, 316, 95 S.Ct. 1802, 1806, 44 L.Ed.2d 186.

Considering the limitations placed upon the use of Section 42(a) by the Court, and guided by its approval of the use of this procedure only when refusal to testify following an order of the court "disrupts and frustrates an ongoing proceeding," we conclude that the circumstances present before the trial court on this occasion did not meet this standard. Here there was no ongoing proceeding that was frustrated. See *United States v. Brannon,* 546 F.2d 1242 (5th Cir. 1977). The criminal contempt conviction must therefore be reversed.

█ We now turn to the civil contempt judgment. The government does not dis-

pute the right of Montgomery to challenge on this appeal the correctness of the trial court's order. Montgomery made a three way challenge. He first contended that the information sought from him by the questions amounted to a lawyer's "work product." He then contended that, in any event, the questions sought to have him disclose the substance of what he called "confidential communications" between client and lawyer. Finally, he contended that the answers to the questions sought were irrelevant to a determination by the IRS of his client's tax liability.

Since we agree with Montgomery's position with respect to the lawyer/client confidential communication ground, we pretermit discussion of the other two contentions. The questions to which objection was made on the ground of confidential communication were: "What books and records belonging to A. Burton Hankins did you examine?" and "When was the first time you examined the records of A. Burton Hankins?", together with some 30 additional questions asking him expressly whether he had seen certain work papers prepared in connection with the preparation of income tax returns for Hankins and his several associated businesses. He was then questioned as to whether, if he had seen any of the described books and records, they were complete at the time he saw each of them, the questions making specific reference to certain items as to which completeness of the books were involved. He was then asked whether any of the described documents were ever in the possession, custody or control of Montgomery or his law firm and whether the described records had been destroyed.

It is clear that the record indicated that after he had been engaged as an attorney to assist Hankins, for himself and for his several associated businesses, in income tax difficulties involving the years 1971 and 1972, he had obtained certain books and records from Hankins for the purpose of

assisting him in preparing for his representation of his client's interests. It is important to note that Montgomery does not contend that any books and records which were in his possession at the time the subpoena was served on him, were not subject to being delivered to the Internal Revenue agent. In view of this state of the law, the United States contends that the questions asked of Montgomery, as to precisely which of the books and records of the taxpayer he had seen and when he had seen them could not be the subject of a privileged communication between lawyer and client. We conclude that this does not follow. Neither party cites a case in which precisely the issue we have before us has been resolved, but we are of the view that the relation between a lawyer and client require that the client feel absolutely free to divulge everything connected with his case to his lawyer to assist the latter in preparing for the representation of the client, and that this relationship would be seriously weakened if the client had the fear that the lawyer could disclose to an opposing party the identity of the client's records that he had used to build up his case.

Since the questions did not seek Montgomery's testimony as to any work he had performed with respect to the records,[1] we are inclined to think that the work product rule does not apply, but as stated, we pretermit that question. See in connection with the work product rule, *United States v. Nobles,* 422 U.S. 225, 237–238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975), where the Supreme Court speaks of the work product of a lawyer as being "materials prepared by an attorney acting for his client in anticipation of litigation." See also, *In re Grand Jury Proceedings, McCoy and Sussman, Appellants,* 601 F.2d 162 (5th Cir. 1979).

In considering the attorney/client privilege claim, we are guided by this Court's opinion in *United States v. Jones,* 517 F.2d 666, 674 (5th Cir. 1974), where we said:

---

1. It may be that the question as to the completeness of the books, and as to their accuracy may be an exception to what is here stated.

In this country the privilege has belonged traditionally to the client, not the lawyer. It is a creature of public policy calculated to encourage people to seek legal advice on the basis of frank, useful communications. The purpose of the privilege would be undermined if people were required to confide in lawyers at the peril of compulsory disclosure every time the government decided to subpoena attorneys it believed represented particular suspected individuals. *Just as the client's verbal communications are protected, it follows that other information, not normally privileged, should also be protected when so much of the substance of the communications is already in the government's possession that additional disclosures would yield substantially probative links in an existing chain of inculpatory events or transactions.* The client may reasonably expect the lawyer to maintain silence in such circumstances, for disclosure could drastically diminish the value of legal discussions or planning that took place previously, or at least alter the course of subsequent strategy. [Emphasis added.]

Persuasive also is the analysis in McCormick on Evidence:

As to these preexisting documents two notions come into play. First, the client may make communications about the document by words or by acts, *such as sending the document to the lawyer for perusal* or handing to him and calling attention to its terms. These communications, and the knowledge of the terms and appearance of the documents which the lawyer gains thereby are privileged from disclosure by testimony in court. [Emphasis added.]

McCormick, Evidence § 89 (2d ed. 1972, p. 184).

We therefore conclude that the attorney/client privilege should have been sustained by the trial court with respect to the specific questions asked by the special agent, and repeated by reference at the court hearing. The judgment for civil contempt must also therefore be reversed.

Judgment REVERSED and the case is REMANDED to the district court for further proceedings not inconsistent with this opinion.