**UNITED STATES of America, Appellee,**

v.

**CHEUNG KIN PING and Lai Mong Wah, Defendants-Appellants.**

**Nos. 411, 412, Dockets 76–1362, 76–1368.**

United States Court of Appeals, Second Circuit.

Argued Nov. 5, 1976.

Decided Feb. 28, 1977.

Rehearing and Rehearing En Banc Denied April 22, 1977.

---

Gilbert S. Rosenthal, New York City, for defendant-appellant Cheung Kin Ping.

Julia P. Heit, New York City, for defendant-appellant Lai Mong Wah.

Richard F. Lawler, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., Thomas E. Engel, Frederick T. Davis, Asst. U. S. Attys., Southern District of New York, New York City, of counsel), for appellee.

Before MOORE, MANSFIELD and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Appellants Cheung Kin Ping ("Cheung") and Lai Mong Wah ("Lai") appeal from judgments of conviction entered in the United States District Court for the Soutern District of New York after a jury trial before Judge Charles L. Brieant, Jr. Appellants' convictions relate to their involvement in a heroin smuggling and distributing operation conducted between Hong Kong and the United States from late 1970 until April 1972.[1] Appellants do not chal-

1. Cheung was convicted of conspiracy, 21 U.S.C. § 846, of distributing eight ounces of heroin, 21 U.S.C. § 841, and of using a telephone to further a narcotics conspiracy, 21

lenge the sufficiency of the evidence against them, and a review of the rather complex facts underlying the smuggling operation in which they were involved is not critical to an understanding of the numerous procedural issues raised on appeal. Accordingly, we turn directly to those post-conspiracy events which relate to the appellants' individual claims.

*Cheung's Double Jeopardy Claim.*

■ The conspiracy involved in this case came to an end during the late evening hours on April 5, 1972, when Cheung, his co-defendant, Sammy Cho, and an unindicted co-conspirator, Ting Yee Fong ("Ting"), were arrested. Customs agents caught them red-handed in Miami, Florida, trying to take twenty-two pounds of pure heroin off the boat which had transported it from Hong Kong. On April 13, 1973, the grand jury for the Southern District of Florida returned a four-count indictment naming Cheung, Ting and Cho. Count I charged Ting with possessing the heroin with intent to distribute it; Count II charged Ting with distributing the heroin; Count III charged all three defendants with importing the heroin; and Count IV charged Cheung and Cho with possessing heroin with intent to distribute it. Ting pled guilty to Count III and testified against Cheung and Cho. At trial, problems developed as a result of the court interpreter's difficulty with the Chinese dialect spoken by Ting. The trial judge declared a mistrial on his own motion, and a second trial was begun roughly two weeks later over the defendants' double jeopardy objections. Both defendants were convicted on Counts III and IV, after separate trials, but the Fifth Circuit Court of Appeals, reversed on double jeopardy

grounds. *United States v. Kin Ping Cheung*, 485 F.2d 689 (5th Cir. 1973).[2] On June 23, 1975, a grand jury in the Southern District of New York indicted Cheung for the crimes of which he now stands convicted, namely, conspiracy, distributing eight ounces of heroin in September, 1971, and illegal use of a telephone. Cheung now claims that the government may not, consistent with the double jeopardy clause, prosecute him for these additional crimes. This claim is without merit. Both in law and in fact, the offenses charged in the Southern District were different from those for which Cheung was tried in Florida. The fact that crimes with which Cheung was charged in Florida formed part of the smuggling conspiracy with which he was charged in New York is not sufficient on the facts of this case, to make out a double jeopardy claim. *See United States v. Armedo-Sarmiento*, 545 F.2d 785, 792 (2d Cir. 1976), and cases cited therein.

*Cheung's Claim of Pre-Indictment Delay.*

■ Yuin Kwei Sang ("Yuin") was the government's principal witness at appellants' trial. He began cooperating with the government in November of 1974. Cheung agrees, as we think he must, that the government is not responsible for a period of delay during which an important witness is unavailable to it. *United States v. Rubinson*, 543 F.2d 951, 960–62 (2d Cir. 1976). The delay of which Cheung complains, therefore, is the delay of approximately eight months between November of 1974 and June of 1975, when he was indicted. He claims substantial prejudice in the form of the loss of two witnesses. The first lost witness is Sammy Cho, who absconded after

U.S.C. § 843(b). He was sentenced to concurrent seven-year terms of imprisonment on the conspiracy and distribution charges with a three-year special parole. Imposition of sentence on the communications charge was suspended and Cheung was placed on six months' probation. Lai was convicted of conspiracy, 21 U.S.C. § 846, of importing five pounds of heroin, 21 U.S.C. § 952, of distributing that same heroin, 21 U.S.C. § 841, and of distributing an additional one kilogram of heroin, 21 U.S.C. § 841. She was sentenced to five years impris-

onment on the conspiracy charge and to concurrent ten-year sentences on the importation and distribution charges. The ten-year sentences are to run consecutively to the five-year sentence. She was also given a three-year special parole.

**2.** The basis for the Fifth Circuit's conclusion was that the trial judge abused his discretion in finding that a "manifest necessity" for a mistrial existed.

his release on the Florida charges. The Fifth Circuit decided the case of *United States v. Kin Ping Cheung, supra,* on October 31, 1973. Cheung and Cho were both released in December of 1973, and Cho became a fugitive at that time. Because Cho became a fugitive prior to the beginning of the eight-month delay of which Cheung complains, it is clear that the delay was not the cause of the alleged prejudice. The second lost witness was Liu Yeuh Han ("Liu"), an unindicted co-conspirator who died in February or March of 1975—three or four months after Yuin began cooperating. Liu's death occurred sufficiently prior to "any realistic trial date," *United States v. Stein,* 456 F.2d 844, 848 (2d Cir.), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972), to make it improbable that any prejudice it may have caused Cheung was the result of government delay.

Furthermore, there is no indication that the delay complained of was an "intentional device to gain tactical advantage over the accused." *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971); *cf. United States v. Didier,* 542 F.2d 1182, 1187 (2d Cir. 1976). Cheung's failure to demonstrate improper or prejudicial delay is fatal to his claim.

*Cheung's Claims Regarding the Court's Charge.*

During his summation, Cheung's counsel argued to the jury that it should consider the public policy implications of the government's favorable treatment of cooperating witness Yuin. He told the jury that "you have a right to say by your verdict to the government, we don't want you to make deals with a man like Yuin." In his charge, Judge Brieant instructed the jury that accomplice testimony should be scrutinized carefully, but he explained that such testimony should not be automatically rejected, for accomplices are capable of giving a truthful version of the facts, and they are frequently the government's major source of evidence of criminal conduct. The jury was warned that it should consider whether any of the special benefits given to a cooperating witness had induced him to testify falsely, but the trial judge informed the jury that the procedures used in this case had been "permissible." This portion of the charge was entirely fair and balanced, and it conformed with the requirements discussed by this Court in *United States v. Swiderski,* 539 F.2d 854, 859–60 (2d Cir. 1976). Later in his charge, the trial judge responded specifically to the argument made by Cheung. He instructed the jury that law enforcement policy was not its concern, and he admonished the jury to focus its attention on the real issue, namely, whether the government had proved the facts alleged in the indictment beyond a reasonable doubt. "[I]f . . . you want to send a message to the powers that be" the trial judge explained, "then when the case is over write to your congressman, but don't let that desire to send any message affect you in the meantime in the performance of your sworn duty." After the jury retired, Cheung's counsel objected to this instruction on the ground that it was in the nature of a prosecutor's rebuttal. The trial judge responded that "a common law court still has the right to spear a red herring." On this appeal, Cheung vigorously maintains that the trial judge's charge was improper. The authorities he cites stand for the broad proposition that a trial judge should not become an advocate for either side. *Quercia v. United States,* 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); *United States v. Araujo,* 539 F.2d 287 (2d Cir. 1976); *United States v. Carter,* 528 F.2d 844 (8th Cir. 1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1745, 48 L.Ed.2d 206 (1976); *United States v. Natale,* 526 F.2d 1160 (2d Cir. 1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). If Judge Brieant's conduct had reached "the point at which it appears clear to the jury that the court believes the accused is guilty," then Cheung would be entitled to a new trial. *See United States v. Nazzaro,* 472 F.2d 302 (2d Cir. 1973). However, Judge Brieant's conduct did not even approach that point. Indeed, his remarks were well chosen, accurate and appropriate,

given the nature of counsel's summation. Counsel had urged the jury to acquit Cheung on the basis of extraneous public policy considerations. In the face of such an argument Judge Brieant would have been remiss if he had failed to redirect the focus of the jury toward the issues of credibility and bias which arise when the government has given special treatment to a cooperating witness and toward the central issue of whether the government had proved its case. The trial court does indeed have the right to "spear a red herring," and in doing so Judge Brieant can hardly be said to have committed error. *See Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).

█ Cheung also challenges that portion of Judge Brieant's charge which instructed the jury that no adverse inference could be drawn from the government's failure to call a witness equally available to both sides. When the instruction was given, the trial judge had the benefit of neither our recent decision in *United States v. Erb*, 543 F.2d 438 (2d Cir.), *cert denied*, 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976),[3] nor objection from counsel. Because Cheung failed to present his claim to the trial judge, we decline to consider it. *Id.* at 445. For the same reason, we decline to consider Cheung's attack on that portion of the charge in which Judge Brieant explained to the jury that if they believed that Cheung had told one of his co-conspirators to lie, then it could consider that fact as circumstantial evidence of consciousness of guilt.

*Cheung's Claims Regarding Inflammatory Testimony.*

During the cross-examination of Yuin, Cheung's counsel sought to impeach Yuin's credibility by showing that Yuin, a heroin smuggler since 1969, had been given special treatment in return for his testimony. Counsel elicited the fact that the government had promised, inter alia, to intercede on Yuin's behalf with the immigration authorities in order to prevent him from being deported to Hong Kong and in order to bring his wife from Hong Kong to the United States. In response to the question "You like it here in the United States, don't you Mr. Yuin?" the government's witness responded, "Now that I have become a witness here, it would be very dangerous for me to return to Hong Kong." When asked whether he had been threatened, Yuin replied that he had not. On redirect, the government elicited, over objection, the fact that Yuin's wife had told him that she had been threatened in Hong Kong. The trial judge overruled Cheung's objection, and gave the jury the following limiting instruction:

There is absolutely no evidence, and no charge here, that anybody who is on trial before you had any connection with any threats. I will rule, however, that since this question of his wife coming to the U.S. was gone into on cross examination it may be brought out. However, the jury is to understand that these defendants have been here in the U.S., and not in Hong Kong, and there is no suggestion whatever, and none is intended by any of these questions, that they had anything to do with any threats.

\* \* \* \* \* \*

The jury will understand that he is being asked what his wife told him, and it's not taken for proof of the fact that she was actually threatened but it may be taken for proof of this witness' state of mind as affecting any of his dealings with the government or anything that the government may have done for his family.

Later in the trial, Ting testified, on direct examination by the prosecutor, that he had been promised government protection in the event that any threats should be made against him or his family.

█ On this appeal, Cheung argues that the admission of this evidence concerning threats so inflamed the jury as to deny him a fair trial. The trial judge has broad

---

**3.** In *Erb* "[w]e adhere[d] to the view that the failure to produce an equally available witness is open to an inference against both parties . . .." 543 F.2d at 445.

discretion in weighing the probative value of relevant evidence against its prejudicial nature. Reversals on the ground that discretion has been abused are rare. *See, e.g., United States v. Robinson,* 544 F.2d 611 (2d Cir. 1976) (petition for rehearing granted.) We believe Judge Brieant's careful limiting instruction was sufficient to protect the defendants from any undue prejudice, and on the facts of this case, we conclude that there was no abuse of discretion. *See United States v. Panebianco,* 543 F.2d 447, 454–455 (2d Cir. 1976).

*Cheung's Motion for a Suppression Hearing.*

The only truly novel point raised by Cheung on this appeal relates to the trial judge's denial of his motion for a suppression hearing to determine the admissibility of certain statements made by him at the time of his arrest in Florida. The district court denied the motion for the following reasons:

> The District Court in the Florida trial held a suppression hearing, and denied an identical motion. Unfortunately, its decision or findings have not been available to this Court, although requested. In the absence thereof, regularity is to be assumed.
>
> This Court has reviewed the transcript of that hearing. On that transcript, a finding that the admission was voluntary and admissible could not be regarded as clearly erroneous. Defendant should be collaterally estopped to relitigate the issue here. The Court declines to hold a further suppression hearing on a claim regarded as not even colorable.

At the outset, we note that despite the efforts of both the government and appellant Cheung the record still does not contain a copy of the decision or findings of the Florida district court. Like Judge Brieant, this Court has reviewed the transcript of the suppression hearing conducted in Florida. A brief explanation of its contents is necessary to an understanding of the issues presented on this appeal.

Cheung and Cho were arrested on April 5, 1972, by Customs agents Frank Torres and Phillip Cascavilla. Both agents testified at the hearing. They agreed that Cheung spoke virtually no English and testified that they used Cho as an interpreter. Cho translated, among other things, a reading of their rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Cheung and Cho expressed an understanding of their rights and a willingness to cooperate in identifying their accomplice Ting. Neither was willing to sign a waiver of rights form, however, "pending seeing a lawyer." Shortly after the arrests were made, Special Agent Stephen Csukas arrived. He was told that the suspects had been informed of their rights, but he did not recall whether he had been told of their refusal to sign a waiver of rights form. Csukas explained to both men, for the second time, what their rights were. He had no doubt that, with the aid of Cho, he had succeeded in conveying his meaning to Cheung, who, by this time, was eager to cooperate by identifying Ting. Cheung was taken aboard the ship on which the heroin had been transported, and he identified Ting, who was taken into custody. Cheung, Cho and Ting were transported to Customs headquarters, separated, booked and questioned. Special Agent William Mason, III conducted the interrogation of Cheung. He was assisted in this effort by one T. S. Gho, a sea cadet who had been provided by the captain of Ting's ship. Mason informed Cheung of his rights for a third time with Gho acting as interpreter. Cheung again expressed his understanding and then made the admissions he now seeks to suppress. Around 5:00 A.M., Cheung was again informed of his rights. He expressed his understanding, but when the scope of the questioning expanded beyond the three suspects who had already been caught, he asked for a lawyer. He was allowed to make two phone calls in order to contact a lawyer, and he called the New York residences of Yuin and Lai. None of the agents testified that Cheung ever expressly waived his rights, either orally or in writing. After Cheung asked for a lawyer, however, the interrogation ended.

Michael Masis, a Florida lawyer, testified, in substance, that it was almost impossible to communicate with Cheung in English, and he said that he had used Cho as an interpreter. Cho testified that he did not translate for the agents, and he said he did not recall whether he or Cheung had been read their rights. Cheung testified that he had not understood the English versions of his *Miranda* rights, that Cho had not translated for him and that he had only understood a portion of Gho's translation because Gho spoke a different Chinese dialect. According to Cheung, Gho told him that the agents had said no charges would be brought if he confessed. Cheung said he asked Gho to convey his desire to see a lawyer, but he did not know if Gho complied with this request. On cross-examination, Cheung admitted that he had answered some of the agents' questions in English.

On the basis of the evidence presented at that hearing, the Florida district court ruled that Cheung's statements were admissible. At Cheung's trial in Florida, his statements were used against him. He appealed his conviction and won a reversal on double jeopardy grounds. It is not clear from the record whether the admission of the statements was assigned as error on appeal. Judge Wisdom's opinion in *United States v. Kin Ping Cheung,* 485 F.2d 689 (5th Cir. 1973), contains no reference to any issue other than the double jeopardy claim upon which the reversal was based.

Prior to his trial in the Southern District of New York, Cheung moved for suppression of the statements he made to the Customs agents in Florida. That motion was denied without a suppression hearing on the ground that Cheung was collaterally estopped to relitigate the issue. As far as we are aware, the trial judge's application of the doctrine of collateral estoppel against a criminal defendant is unprecedented in this Circuit. The government points out that if Cheung had succeeded in obtaining the suppression of his statements in Florida, the government would be precluded from relitigating the issue, *see United States ex rel. Di Giangiemo v. Regan,* 528 F.2d 1262 (2d Cir. 1975), *cert. denied,* 426 U.S. 950, 96

S.Ct. 3172, 49 L.Ed.2d 1187 (1976), and they argue that there is no reason in logic or fairness why the estoppel should not be mutual. The government refers us to such cases as *Hernandez-Uribe v. United States,* 515 F.2d 20 (8th Cir. 1975), *cert. denied,* 423 U.S. 1057, 96 S.Ct. 791, 46 L.Ed.2d 647 (1976), in which a defendant who had previously pled guilty to a crime which included alienage as an essential element was collaterally estopped to deny alienage in a later prosecution for a crime which also included alienage as an essential element. Cheung relies upon those Supreme Court cases which hold that doctrines of res judicata do not apply in habeas corpus cases. *E. g., Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). Neither side has devoted much analysis to the question of whether an application of the doctrine of collateral estoppel against Cheung would preclude him from relitigating the admissibility of his statements. Their failure to do so is rather surprising, for it is clear that Cheung's right to relitigate issues is at least as great as that of a civil litigant in an analogous situation. *See United States v. Oppenheimer,* 242 U.S. 85, 87, 37 S.Ct. 68, 61 L.Ed. 161 (1916).

 Because Cheung won a reversal of his conviction on appeal to the Fifth Circuit Court of Appeals, he is entitled to invoke the general rule that determinations adverse to the winning party do not have preclusive effect. 1B Moore, Federal Practice ¶ 0.443[5], at 3922 (1965). Since the doctrine of collateral estoppel would not have precluded Cheung from relitigating his claims in any event, it is unnecessary for us to reach the more difficult issue of whether collateral estoppel can ever be invoked by the government in a criminal case.

Our conclusion that Cheung was not collaterally estopped does not end our inquiry, however, for we must examine the effect of the error. In doing so we will assume that if a suppression hearing had been held, the government would have been unable to carry its "heavy burden" of demonstrating that Cheung "knowingly and intelligently

waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). The admission of Cheung's statements under such circumstances would have been error, and if we believed that there was a reasonable possibility that their exclusion would have changed the jury's verdict, we would reverse. On the facts of this case, however, reversal is not warranted.

■ At Cheung's trial in New York, Customs agents testified that during his interrogation in Florida Cheung told them that in late 1971 he was approached by Yuin who asked him to go to Hong Kong to recruit an individual to bring a suitcase containing something dangerous into the United States. Cheung said he borrowed between three and six thousand dollars from Yuin and went to Hong Kong. He met Ting, with whom he had previously been acquainted, and asked him to bring the suitcase into this country. Ting agreed and was paid one thousand dollars by Cheung. Ting was told that Yuin would bring him the suitcase. When Cheung was back in New York, he received a phone call from Ting, who was then in the Panama Canal Zone, and was informed that Ting would be arriving in Miami on April 5, 1972.[4] Cheung and Cho purchased airline tickets and flew to Miami, where they rented two cars.

If these admissions had comprised a substantial part of the government's case against Cheung, they might well have had a significant impact on the jury's verdict. When they are considered together with the other evidence against Cheung, however, we believe the error, if any, in admitting them was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The admissions related primarily to the importation of the twenty-two pounds of heroin. Yet there was no doubt concerning Cheung's involvement in that transaction,

for he had been caught in possession of the heroin. Cheung's mention of his loan from Yuin was cumulative, at best, for the government proved, through a combination of Yuin's testimony and documentary evidence, that the loan had been made. To the extent that Cheung's admissions tended to prove a relationship between him and Yuin, it, too, was merely cumulative. Cheung's own American Express card statement placed him at a hotel in Hong Kong at a time when several of his co-conspirators, including Yuin, Lai, Cho and Ting were there. Yuin, Ting and even Lai testified to meetings with Cheung in Hong Kong, so it can hardly be said that Cheung's statement about having gone to Hong Kong had any impact on the jury.

It is abundantly clear that wholly apart from Cheung's admissions the government proved his involvement in the importation of the twenty-two pounds of heroin. When it is remembered that Cheung was not on trial in this case for that earlier importation of heroin into Florida, but rather for offenses described below, it becomes equally clear that the exclusion of his statements would not have changed the outcome. Cheung's conviction for distributing heroin was based on his involvement in a distribution that occurred in August of 1971 when he acted as a courier for Liu Yueh Han. The evidence shows that Cheung was engaged in an ongoing narcotics conspiracy from at least that time until the time of his arrest. According to Ting, Cheung had been involved with narcotics as early as late 1970 or early 1971. The communications charge was based on Cheung's use of the telephone when Ting called from the Canal Zone to tell him when the boat would arrive in Miami. While it is true that Cheung admitted using the telephone during his interrogation in Miami, his admission was not even mentioned by the prosecutor during summation. Indeed, it was unnecessary to do so. Cheung's American Express card statement proved that Cheung and Cho had

4. At his trial in Florida, Cheung testified in his own behalf, and although he disclaimed knowledge that the suitcase contained heroin, he admitted that he had been summoned to Miami as a result of Ting's phone call.

flown to Miami, where they arrived shortly after Ting's ship reached port. There is no reason why the jury should have doubted Ting's logical account of the manner in which he summoned his accomplices, namely, by telephone. We do not believe that the jury would have discredited Ting's account if Cheung's statement to the agents had been excluded, particularly where, as here, there is no alternate explanation for Cheung's arrival in the right place at the right time.[5]

*Lai's Claims Regarding The Use Of An Interpreter.*

■ The government's main witness, Yuin, testified through an interpreter, despite the fact that he speaks English fairly well. His testimony consumed roughly two and one-half days, and it covers over 250 pages of the trial transcript. Over 60 of those pages cover Yuin's cross-examination by Lai's counsel. At no time during any of this did Lai suggest, as she does now for the first time on appeal, that the use of an interpreter violated her Sixth Amendment right to confront the witnesses against her. In his charge, Judge Brieant instructed the jury that

> If a witness were to pretend or feign ignorance of the English language, you may consider it in the same manner as you would a false statement of a witness in determining whether or not to believe his testimony.

In *United States v. Frank,* 494 F.2d 145, 157–58 (2d Cir.), *cert. denied,* 419 U.S. 828, 95 S.Ct. 48, 42 L.Ed.2d 52 (1974), this Court found no abuse of discretion where the trial judge allowed a government witness to use an interpreter during cross-examination despite the fact that she had a substantial command of the English language, had testified in English during her direct examination, and resorted to an interpreter only "when a cross-examiner seemed to approach at least a minor success." *Id.* at 157. Defense counsel in that case made numerous objections, and unsuccessfully sought an evidentiary hearing on the witness' proficiency in English. The facts of the case at bar, particularly in view of the absence of any objection, do not justify reaching a different result from that reached in *Frank.*

*Lai's Brady Claim.*

During the luncheon recess on the third day of trial, while Yuin was still on cross-examination, the Assistant United States Attorney who was trying the case asked Yuin whether he kept a diary. Yuin responded that he did, and he gave two books to the prosecutor. One was a large bound volume, and the other was a spiral-bound notebook. Except for a few rather minor portions, the diary was written in Chinese. It covered the time period from January 1, 1975—shortly after Yuin's extradition from Hong Kong to the United States—through June, 1976—the time of trial. The prosecutor examined the books during lunch and when he returned to court he informed the trial judge and defense counsel of the existence of the diary and the fact that Yuin retained possession of it. After some discussion, the diary was marked for identification, and made available to the defense. The trial judge directed that the diary not be taken out of the courthouse. During Yuin's cross-examination, he apparently noticed that the defense was examining his diary, and he requested that this not be done. At the court's direction, the diary was turned over to the prosecutor. Later that day, the diary was discussed at length, and the court instructed the prosecutor to have the diary translated as quickly as possible and to make any determinations necessary to comply with *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The following day, the government reported that because of the size of the diary a full translation might take two weeks. In order to expedite matters, while at the same time insuring that Yuin's interests in safety and privacy would be protected, the trial judge suggested that the government have Yuin go over the diary with a view to identifying those portions as to which he wished to assert a privilege. The balance

---

**5.** See note 4, *supra.*

of the diary was to be copied and turned over to the defense, and the portions not turned over would then be screened by the prosecutor for *Brady* material. At this point, Lai's counsel moved for a mistrial on the ground that the diary had been returned to Yuin and remained in his possession. Counsel suggested that the diary might easily be tampered with. The motion was denied. The next day, Lai's counsel renewed his objection to Yuin's possession of the diary, and again suggested the possibility of tampering. After roughly five days in Yuin's possession, the entire diary was turned over to the defense with the understanding that only the defendants' lawyers and interpreters would be allowed to read it. Counsel agreed to this last condition. The diary was examined, and although counsel made additional allegations concerning the possibility that pages might have been removed from the diary, there is no basis in the record for the conclusion that the diary was altered in any way. The defense introduced four pages of the diary into evidence as specimens of Yuin's English handwriting. Yuin was not recalled to the stand for additional cross-examination on the basis of the contents of the diary, although he was available for that purpose.

■ We disapprove of the manner in which Yuin's diary was handled. If the diary had contained exculpatory information or other material that would have been useful to the defense for the purpose of impeaching Yuin's credibility, the government would have been required under *Brady v. Maryland, supra,* to turn over such material to the defense. *See, e. g., United States v. Seijo,* 514 F.2d 1357 (2d Cir. 1975). By allowing a potential source of such material to remain in the possession of the very witness whose credibility it might be used to impeach, the government created a serious risk that significant material would be destroyed or tampered with. Under the circumstances, the diary should have been impounded with the court, subject to use and inspection by both sides under conditions that would protect the defendants from destruction or alteration, and the witness from unwarranted invasions of privacy or disclosure of information that might jeopardize his safety. Under no circumstances should the diary have been returned to the unsupervised possession of the witness.

On the other hand, there is no indication that the risk created by leaving the diary in Yuin's possession ever matured into prejudice to the defendants. The defense was eventually given the diary, and they made virtually no use of it. It apparently contained no exculpatory information, and any impeachment evidence it might have contained was apparently not of sufficient importance to justify recalling Yuin to the stand. There is nothing in the record to substantiate Lai's allegations concerning the possibility that pages were removed or that passages were altered. On balance, therefore, we do not believe that the handling of Yuin's diary was sufficiently prejudicial to require a reversal, much less the dismissal of the indictment sought by the appellants.

The convictions are affirmed.