UNITED STATES of America

v.

Adam O. RENFROE, Jr.

Crim. No. 85–216.

United States District Court,
W.D. Pennsylvania.

May 23, 1986.

J. Alan Johnson, U.S. Atty., W.D. Pennsylvania, Pittsburgh, Pa., for plaintiff.

Samuel C. Stretton, West Chester, Pa., for defendant.

## OPINION

DIAMOND, District Judge.

The respondent, Adam O. Renfroe, Jr., was lead counsel for one Curtis Strong who had been charged in this District in a fourteen-count indictment with distributing, and possessing with the intent to distribute, cocaine, in violation of 21 U.S.C. § 841(a)(1). Mr. Strong's trial commenced on September 3, 1985, and a guilty verdict was returned by the jury on September 20, 1985. Immediately following the verdict, the court held the respondent in contempt and sentenced him to thirty days imprisonment for arguments he had made in his summation which were in violation of specific rulings and orders made by the court the previous day and during respondent's summation.

Respondent's oral motion for reconsideration was denied by the court, but execution of the sentence of imprisonment was stayed and respondent was granted two weeks within which to engage counsel to file and brief appropriate motions to reconsider.

Subsequently, counsel entered an appearance for the respondent and filed petitions "for an arrest of judgment, for a new trial and for reconsideration", "to modify and reconsider sentence", and "to add an amendment to his petition for arrest of judgment, for a new trial and for reconsideration". Briefs were filed and oral argument held. At the conclusion of oral argument, the court indicated that it would deny the petitions, but that it would not enter a final order until it could file a written opinion.

### I. Background

The government's case against the defendant Curtis Strong consisted essentially of the testimony of a number of major league baseball players to whom Mr. Strong allegedly had sold cocaine. Each of these witnesses testified under a grant of immunity conferred by the court on applications filed by the government pursuant to 18 U.S.C.A. § 6001 et seq.

During his opening argument, at several side bar conferences, in statements to the news media, and throughout his cross-examination of these witnesses, the respondent Renfroe expressed criticism of the immunity policy of the government which he characterized variously as "scapegoating" the defendant Strong while permitting the witnesses to go unpunished; or as prosecuting the "little guy" while letting the "big guy" go; or as condoning the use of drugs by the immunized ballplayers. As a result, it became apparent to the court that in his summation to the jury the respondent would argue in effect that the jury should express its disapproval of the immunity policy of the government by acquitting the defendant Strong. It was equally apparent that counsel for the government would respond with an argument justifying the immunity grants and a call for endorsement of its policy. It was clear, therefore, that unless the court intervened, the jury's deliberations would be diverted from consideration of the issues properly before it to matters quite irrelevant, and that it would be invited to render a verdict on wholly inappropriate grounds.

Of course, it was the duty of the court to prevent this subversion of the judicial process. In *United States v. Billy G. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Court addressed the question of how trial courts should deal with improper argument of defense counsel and the so-called "invited response" of counsel for the government. The Court stated at page 8:

It is clear that counsel on both sides of the table share a duty to confine arguments to the jury within proper bounds. Just as the conduct of prosecutors is circumscribed, "[t]he interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders." *Sacher v. United States,* 343 U.S. 1, 8, 72 S.Ct. 451, 455, 96 L.Ed. 717 (1952).

470 U.S. at ——, 105 S.Ct. at 1045, 84 L.Ed.2d at 11, it continued:

"Invited responses" can be effectively discouraged by prompt action from the bench in the form of corrective instruc-

tions to the jury, and when necessary, an admonition to the errant advocate.

Plainly, the better remedy in this case, at least with the accurate vision of hindsight, would have been for the District Judge to deal with the improper argument of the defense counsel promptly and thus blunt the need of the prosecutor to respond.

The Court cited with approval the ABA Standards for Criminal Justice 4–7.8 (2d ed 1980), which provide, *inter alia:*

"(d) A lawyer should refrain from argument which would divert the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions of the consequences of the jury's verdict.

"(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds."

*Young,* 470 U.S. at —— n. 7, 105 S.Ct. at 1043 n. 7, 84 L.Ed.2d at 9 n. 7.

In view of the foregoing, on Wednesday afternoon, September 18, 1985, after both sides had rested and the court had ruled on their points for charge, the court raised two additional matters relative to closing arguments.

First, because during cross-examination counsel for the defendant had suggested that the witnesses against the defendant were trying to put him in jail, the court ruled that counsel was prohibited from discussing possible punishment and from making any reference to jail. Mr. Renfroe indicated that this was "fine". (V. 12, p. 174).[1] The court then opened for discussion the matter of counsel's argument concerning the grants of immunity in the case and stated:

I think, and counsel can disabuse my mind if I'm wrong, I believe that it is improper to suggest to the jury that they should express in their verdict their attitude about the propriety or wisdom of the Government's policy in granting immunity to some witnesses and choosing

to prosecute others. I don't believe that's the jury's function.

If you have a desire to make that kind of an argument to the jury, now is the time to determine whether that is proper argument, rather than for you to make that argument and then for the court to attempt to neutralize it by instructing the jury that it is improper. . . .

(V. 12, p. 175).

An extended discussion then ensued between counsel and the court during which the court indicated a number of times that it was proper for counsel to argue the effect of the grants of immunity on the *credibility* of the witnesses, but repeatedly emphasized that it would be improper to implant in the mind of the jury the thought that somehow its verdict should reflect its approval or disapproval of the government's immunity *policy.* (V. 12, pp. 176–187).

The court noted the clear distinction between arguing immunity as it affected credibility, which was proper, and arguing to the jury that its verdict should somehow reflect its approval or disapproval of the policy of granting immunity, which the court stated was improper. (V. 12, pp. 177–178).

Indeed, the record reveals that counsel for both sides had intended to engage in the very argument which the court believed to be inappropriate, (*see, e.g.,* V. 12, pp. 176, 181, 182, 183). So, in an attempt to remove any doubt as to its position on the matter, the court read the instruction which it intended to give to the jury:

Because this is going to be the charge, unless you change my mind about it. . . . "It is equally important for you to understand that it would be grossly improper and in violation of your oath to permit any attitude or opinion you may have as to the wisdom or propriety of the Government's policy of obtaining immunity for certain witnesses to affect your verdict one way or the other. It is not your function, it simply is not your function as jurors to express your approval

1. References are to volume and page of the trial transcript.

or disapproval of the Government's immunity policy. You may do that at the ballot box when you vote as citizens, if you wish, but you may not do it in the jury box when you vote as jurors, because, as I have instructed you a number of times, your function as jurors is to determine the facts from the evidence and to apply those facts to the law as the court instructs you on the law in order to arrive at a verdict of guilty or not guilty as to each count of the indictment; and the matter of immunity is relevant, as I have instructed you, only as to your consideration of the credibility of witnesses who have been immunized."

(V. 12, pp. 184–85).

After inviting counsel to correct the court if they thought that the instruction was erroneous, Mr. Johnson, the United States Attorney, stated: "Okay, very well. I don't have a problem, then." The court then asked: "Do you have any problem with that, Mr. Renfroe?" and Mr. Renfroe replied: "Sir, I do not." (V. 12, pp. 185–186, *see also,* V. 13, pp. 11–12).

Respondent began his summation at 11:35 A.M. the following morning, Thursday, September 19, 1985. After preliminary comments, during which he several times violated our order of the previous day by reminding the jury that its verdict could result in his client going to jail (V. 13, p. 67), Mr. Renfroe commenced his attack on the government's use of immunity:[2]

p. 73

MR. RENFROE: Now, ladies and gentlemen, as far as—as long as I can remember, as far back as I can recollect, in any courthouse around the country, in order to get the big men, the little boy, the little guy, the low man on the totem pole has always been given immunity so he can testify against the big guy. Never, ever in my life, in this country, until now, has the big guy been receiving immunity and he is supposed to testify against the little guy.

MR. JOHNSON: I object to that statement, Your Honor.

THE COURT: Sustained.

2. In this section of our opinion in order accurately and objectively to reflect the timing and sequence of events, we will cite the relevant page and line of the transcript. Each page of

MR. RENFROE: That special treatment, Your Honor—that special treatment, ladies and gentlemen.

THE COURT: The objection is sustained—

MR. RENFROE: Yes sir.

THE COURT: —as you were instructed yesterday as to the limits of the argument with regard to immunity, and the court will instruct the jury as to the use that the jury properly may make of the immunity in this case and the use to which the jury may not make in this regard.

MR. RENFROE: May I proceed?'

THE COURT: Yes.

MR. RENFROE: Now, I submit to you, ladies and gentlemen, that the Government seeks to have you, as jurors, to legalize the sale and use of cocaine among the major league baseball players by prosecuting my client, Curtis Strong, so long as the ballplayers testify against him. I ask you now, is your sense of justice, ladies and gentlemen, so bizarre that you would look favorably upon these witnesses called by the government—

MR. JOHNSON: Objection to that statement, Your Honor.

THE COURT: The objection is sustained. That is simply another variation on the same theme, Mr. Renfroe. Do not make that argument.

Thereafter at transcript p. 75, L. 17 through p. 84, L. 23, Mr. Renfroe made an extended and essentially proper argument on the credibility of the witnesses who had been granted immunity. However, he then returned to the prohibited theme:

These men said it all, insofar as the Government's case is concerned; and that is not enough for you to say Mr. Strong is a scapegoat? Make no mistake about it, there is no coincidence that the Government has granted immunity to the economically powerful for the testimony against one that is not economically powerful.

MR. JOHNSON: Objection to that statement.

THE COURT: The objection is sustained.

MR. RENFROE: I will get off it.

THE COURT: Mr. Renfroe—

MR. RENFROE: Yes.

THE COURT: Mr Renfroe, that argument is undoubtedly—

MR. RENFROE: Fine, Your Honor.

the transcript consists of 25 numbered lines. Volume references are to Volume 13 of the trial transcript until otherwise indicated.

THE COURT: —incorrect and in violation of the court's order.

MR. RENFROE: Fine, Judge.

Ladies and gentlemen, don't you think that multi-million-dollar owners could pick up the phone and call President Reagan and call the State Department anywhere and say, "Hey, look, all this money I am giving you in your campaign, you better do something about it"?

MR. JOHNSON: Objection. That is an improper statement, Your Honor.

At this point the court interrupted respondent's summation and gave the following instruction:

Members of the jury, yesterday, we went over this matter of immunity, and we had full opportunity for both sides to express their views and for the Court to make a ruling. The court made a ruling, and that ruling was that it would be improper to argue to the jury that the jury's verdict somehow should reflect its approval or disapproval of the Government policy of granting immunity, because the policy of the Government to grant immunity is not an issue in this case.

The matter of immunity may be considered by you, as I will explain to you in my instructions, in determining whether a particular witness who has been granted immunity has told you the truth, and that is the sole purpose for which you may use the matter of immunity. Does he have a motive to lie? Does he have a motive to tell you the truth? Or you can believe the matter of immunity has no effect at all. That is your function. That is your prerogative, and we have ruled on that, and we have ruled that your verdict is not to reflect your approval or disapproval of the Government's policy.

As citizens, you have a right to have a view on that and to express that view, but not in the jury box, at the ballot box.

These continued arguments by counsel are in contravention of the court's instructions, and I hesitate to interrupt at this time, but the problem is that, if we do not, then the jury may be confused as to what their function is and as to what they are doing in this case, and, rather than to let this confusion mature in your mind and then to try to disabuse it later with my instructions, I have given you this instruction, and I have directed counsel not to continue with that argument in any shape, manner, or form, except as it pertains to the credibility of a witness, not to the credibility of the Government.

MR. RENFROE: Yes sir.

*See, Young,* —— U.S. at —— —— n. 7, 105 S.Ct. at 1043 n. 7, 84 L.Ed.2d at 8–9 n. 7.

Respondent continued his summation, again attacking the credibility of the witnesses. Several objections were made, some were sustained, some were overruled; and the argument continued without substantial incident from V. 13, pp. 87 to 94. At page 95 counsel for the government objected to a statement of fact made by Mr. Renfroe on the ground that it was not based on evidence in the record. At the side bar which followed, the court admonished Mr. Renfroe.

Mr. Renfroe, you stood here yesterday, and you assured the Court that you would keep away from this immunity argument that the Court and counsel discussed at some length, and I must say to you that your conduct today is virtually contemptuous, and the only thing that is preventing the Court, at this moment, from citing you on the spot for contempt is the fact that, at that point we may have to declare a mistrial. Your conduct is absolutely reprehensible, and it will not go unnoticed by the court.

(V. 13, p. 96–97).

Argument resumed and at page 99, L. 4:

MR. RENFROE: . . . If you go along with along with them now, you will be giving them an unfair advantage. You will be condoning the use and abuse of drugs by ballplayers.

MR. JOHNSON: Objection.

MR. RENFROE: Ladies and gentlemen, you will be condoning it.

Keith Hernandez told you that, after the incident in Kansas City, when the ballplayers went to jail, the use of controlled substances went down drastically; but, ladies and gentlemen, now it is going to go up.

MR. JOHNSON: Objected to as improper argument, Your Honor.

MR. RENFROE: Because they all have—

THE COURT: Overruled.

MR. RENFROE: All they have to do is continue to use and abuse these drugs and point the finger at somebody else, and it is going to go up. Send them a message—

MR. JOHNSON: Objected to, Your Honor.

MR. RENFROE: Send them a message, ladies and gentlemen: "We are not going to condone it."

THE COURT: The objection is sustained. It is a variation on the theme that the Court has instructed counsel not to employ.

MR. RENFROE: Your solution is simple, ladies and gentlemen.

Respondent concluded his argument, the government's rebuttal was had, and the court then recessed from 1:00 P.M. to 2:00 P.M. The court charged the jury between 2:00 and 2:45 P.M. and at 3:00 P.M. the jury retired to deliberate its verdict. Jury deliberations were recessed on Thursday, September 19, at 7:42 P.M. and reconvened the following morning at 9:00 A.M. At 10:25 A.M. court was convened for a question and then recessed until the court was notified at 1:25 P.M. that the jury had arrived at a verdict.

During the noon recess on Thursday, the 19th, the court ordered a transcript of the portion of respondent's summation relative to the immunity policy of the government. This was received by the court late the following morning. In the interim the court researched the matter and drafted a formal citation of contempt. Court was reconvened at 1:25 P.M. on the 20th to receive the jury's verdict. Prior to returning the jury to the courtroom, however, the court advised Mr. Renfroe at side bar:

Also, at the conclusion of the proceedings, regardless of what the verdict is, I have a proceeding involving you. You are to remain in the courtroom, and everybody remain in place.

(V. 14, p. 11).

After taking the verdict, the court asked the jury to remain while other matters were attended to. First, a bail revocation hearing was set for Monday, September 23, 1985. The court then handed to Mr. Renfroe and to counsel for the government four pages of a five page certification and citation of contempt. Counsel were given an opportunity to read the citation and were advised by the court that the fifth page, which was the signature page and contained blank lines for insertion of the sentence, would be provided later.

The court then stated on the record that which had transpired the previous day with regard to the immunity arguments of counsel, the fact that the matter had been discussed and ruled on the day previous to that as well as during the actual summation, and its reasons for the proposed contempt order. It then afforded respondent an opportunity to be heard:

Mr. Renfroe, you have had an opportunity to look at the formal citation which the court has entered in accordance with Rule 42. You have an opportunity, at this time, to state anything that you wish to state in your own defense and with regard to the possible sentence which the court may impose on you at this time.

(Transcript of September 20, 1985, Misc. No. 12413, p. 10.)

Mr. Renfroe then apologized to the court, he indicated that while he may have been over-zealous in defending his client that he had not intended to be contemptuous, that he and his defense team had tried to formulate a closing argument that would not be in conflict with the court's order, and that if the court had permitted him to continue on several instances with his argument that he would have "been able to clear up that which was said, in the sense that I would not have exacerbated the situation of immunity." (Misc. 12413, p. 12). The court replied to respondent's arguments, pointing out, *inter alia*, that Mr. Renfroe was being held in contempt for what he had argued, not for what he had failed to argue. The court then sentenced respondent to thirty days in jail and stayed the sentence pending appeal. (Misc. 12413, p. 14). An oral request to reconsider the sentence and to impose only a fine was denied, but respondent was given two weeks within which to obtain counsel to file, brief and argue a motion to reconsider on respondent's behalf. (Misc. 12413, p. 16).

Page five, the sentence and signature page, was then completed and the certificate and citation of contempt was filed.

## II. Discussion

The twenty or more bases cited by respondent in support of his petitions may be summarized as follows:

Respondent contends, generally, that he was denied due process because of the procedure followed by the court. He argues that he was entitled in the first instance to notice and a full hearing where he would have the benefit of counsel to represent him. He maintains, further, that at such a hearing this member of the court should recuse and another judge preside. He argues that because there was a delay between the time when the alleged contempt occurred and the citation was issued that it was improper and a denial of due process for the court to proceed summarily under Rule 42(a) Fed.R.Crim.P. He believes that the court's ruling prohibiting the immunity policy argument was substantive error and that therefore he cannot be held in contempt for disobeying it. He says that he acted out of zeal for his client and without intent to violate our rulings and that he should have been warned that his conduct was contemptuous. He argues that his summation in disobedience of our order was not an obstruction of justice as required by the contempt statute, 18 U.S.C.A. § 401. And finally he insists that the sentence imposed was cruel and unusual.

The court believes that the procedure it followed was in full conformity with the contempt statute, 18 U.S.C.A. § 401, with the applicable rule of criminal procedure, Rule 42(a) Fed.R.Crim.P., and with the controlling authorities, especially *Sacher v. United States*, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717 (1952), and *Commonwealth of Pennsylvania, et al. v. Local Union 542, International Union of Operating Engineers, et al.*, 552 F.2d 498 (3d Cir.1977), *cert. denied*, 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (1977) (hereinafter, *"Local 542"*).

Virtually every argument made on behalf of the respondent was addressed and resolved adversely to his position by the Third Circuit in the *Local 542* case. In *Local 542*, Abraham E. Freedman, an attorney trying a case non-jury before the district court, insisted on reading extensive portions of a deposition transcript to a witness whom Mr. Freedman was cross-examining. Although ordered by the court to discontinue this practice, counsel persisted. He also continued to state the bases for his objections to the court's rulings on this matter even though the court had directed him a total of seven times to desist. The court held counsel in contempt for this conduct and sentenced him to thirty days in prison.

Subsequently, during the same trial, but six weeks after the first incident, the court sustained objections to a line of questions being asked by attorney Freedman on cross-examination, but he continued this questioning in disregard of the orders. The court reiterated its rulings nine times. Finally, the court called a recess until the following morning at which time it entered a second criminal contempt citation and fined counsel $500.00.

### A.

In his appeal from the two contempt citations, the attorney raised a number of points. First, like Mr. Renfroe here, he contended that he was entitled to violate a direct order of the trial judge because counsel was acting in the zealous protection of his client's interests. The Circuit held, however, that while it did not dispute an attorney's right and duty to be contentious, fearless, and zealous in representing his client's interests, "a direct order of the trial judge fixes the limits of proper advocacy; the vigor permissible in representing a client's interests has never included the flouting of a judge's rulings." *Local 542*, *supra*, at 506. As Judge Rosen, writing for the court, put it: "Disobedience is not an ingredient of contentiousness; defiance is not an element of zealousness." *Id.* at 506.

### B.

The Circuit next considered the argument, also made here, that since the order which counsel disobeyed was invalid, a violation thereof could not form the basis

of a criminal contempt citation. At pages 505–06, the Circuit held that "[i]t is well settled that the invalidity of a court order generally is not a defense in a criminal contempt proceeding alleging disobedience of the order." At page 507 the court quoted from *United States v. Abascal*, 509 F.2d 752 (9th Cir.), *cert. denied*, 422 U.S. 1027, 95 S.Ct. 2621, 45 L.Ed.2d 684 (1975) and *In re Dellinger*, 502 F.2d 813 (7th Cir.1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975):

> "The ability of a trial judge to compel obedience to his orders is fundamental to the proper functioning of our system of justice.... [L]awyers are required to obey even incorrect orders; the remedy is on appeal."

### C.

■ As to the argument that the disobedience to the order did not constitute obstruction of justice as required by 18 U.S.C.A. § 401(1) as the basis for a criminal contempt citation, the court held at page 509: "We have not the slightest doubt that flouting a trial judge's commands is the essence of obstructing the administration of justice." And later at the same page:

> An attorney who, in deliberate disregard of seven direct and explicit orders by the trial judge, pursues a course that he determines to be in the best interests of his client, offends the dignity and authority of the court and thereby obstructs the administration of justice.... To hold otherwise would be to strip trial judges of their power to supervise the proceedings before them, and to clothe counsel with the authority to conduct trials in whatever manner they deem appropriate.

### D.

■ In response to the attorney's contention that he lacked the requisite criminal intent, the court held at p. 510 that:

> "The minimum requisite intent is ... defined as a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful.... Of

course, an actual design to subvert the administration of justice is a more grievous and perhaps more culpable state of mind, but proof of such an evil motive is unnecessary to establish the required intent." [3]

*See also, United States v. Proffitt*, 498 F.2d 1124, 1128–29 (3d Cir.), *cert. denied*, 419 U.S. 1002, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974); *United States v. Wilson*, 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975).

The Circuit held that in determining whether the requisite intent was present it should, among other things, consider the experience of the trial lawyer and the well-established obligation of an attorney to heed even the incorrect orders of a trial judge. Here, respondent stated on several occasions that he had tried in excess of 2,000 cases, *see, e.g.*, V. 7, pp. 17, 149.

### E.

■ Next, the defendant in *Local 542* contended, as does the respondent, that the fact that the trial judge did not bring the contempt charge immediately when the act was committed, but instead delayed 24 hours, was proof that respondent's conduct did not obstruct the administration of justice as required under 18 U.S.C.A. § 401(1) and therefore it was not properly punishable summarily under Rule 42(a), Fed.P. Crim.P., and should have been prosecuted only after notice and hearing before another judge as required by Fed.R.Crim.P. 42(b). First we note that we also cited respondent under § 401(3) for disobedience to our "lawful writ, order, rule, decree, or command." That subsection, of course, does not require an obstruction of justice.

In any event this argument also was rejected by the Circuit in the *Local 542* case on the authority, *inter alia*, of the holding of the Supreme Court in *Sacher v. United States, supra*. The Court cited extensively from *Sacher* and concluded that "if the trial judge deems immediate action inexpedient, he may defer judgment on contemptuous conduct until the comple-

---

**3.** As we develop *infra*, pp. 1549–1550 in our discussion concerning the sentence, it appears

that, indeed, it was respondent's intent to "subvert the administration of justice."

tion of the trial without extinguishing his power to proceed summarily under Rule 42(a)." *Local 542, supra* at 513. (citations omitted).

Although the Court noted that "the continuing vitality of *Sacher* has been questioned," it also noted that it had not been overruled and that in contrast to the procedure in *Sacher* which was the subject of criticism (as much as several months delay in some instances from the time of the contemptuous conduct to the time of the contempt citation and sentence) "the procedure employed in the instant case—a delay of twenty-four hours—is not subject to the same criticism. 3 C. Wright, *supra*, § 707 at 168." *Local 542, supra* at 513. This discussion appears at pages 513 and 514, where the Circuit cites numerous authorities in support of its position that a twenty-four hour delay, such as we had in the instant case, was not only not subject to criticism but was commendable because it enabled the court to be circumspect and cautious before exercising its summary contempt powers. In that regard, *see also, Fisher v. Pace*, 336 U.S. 155, 69 S.Ct. 425, 93 L.Ed. 569 (1949); *MacInnis v. United States*, 191 F.2d 157, 160 (9th Cir.1951), *cert. denied*, 342 U.S. 953, 72 S.Ct. 628, 96 L.Ed. 708 (1952); *Hallinan v. United States*, 182 F.2d 880 (9th Cir.1950), *cert. denied*, 341 U.S. 952, 71 S.Ct. 1010, 95 L.Ed. 710 (1951); *United States v. Hall*, 176 F.2d 163, 168 (2d Cir.), *cert. denied*, 338 U.S. 851, 70 S.Ct. 90, 94 L.Ed. 521 (1949).

Here, the contemptuous conduct occurred at approximately 12:00 P.M. on Thursday, September 19, and the court entered the contempt citation slightly more than twenty-four hours later in the afternoon of Friday, September 20. In the interim, the court ordered a transcript, which was not received until late Friday morning, and, in compliance with the procedures prescribed by Rule 42(a) Fed.R.Crim.P. and *Local 542*, prepared the written citation of contempt.

"It is, of course, quite clear that some delay is permissible in invoking the summary contempt power, since the court may wish to reflect on the necessity of its exercise and time will be needed to prepare the contempt citation." Wright, Federal Practice & Procedure, Criminal 2d, § 707, at p. 841 citing at n. 29, *inter alia, Local 542*.

The Supreme Court in *Taylor v. Hayes*, 418 U.S. 488, 498, 94 S.Ct. 2697, 2703, 41 L.Ed.2d 897 (1974), quoted from *Groppi v. Leslie*, 404 U.S. 496, 502, 92 S.Ct. 582, 586, 30 L.Ed.2d 632 (1972) that "[W]e have stated time and again that reasonable notice of a charge and an opportunity to be heard in defense before punishment is imposed are 'basic in our system of jurisprudence.'" And continued, "Even where summary punishment for contempt is imposed during trial, 'the contemnor has normally been given an opportunity to speak in his own behalf in the nature of a right of allocution.' *Groppi v. Leslie, supra* at 504, 92 S.Ct. at 587, 30 L.Ed.2d 632 (and cases cited therein)." *Taylor, supra* 418 U.S. at 498, 94 S.Ct. at 2703. [footnote omitted]. But, nevertheless, approved as sufficient the notice and hearing that was accorded the defendants in *Sacher*. It stated:

As we noted in Groppi, the contemnors in the Sacher case were "given an opportunity to speak" and the "trial judge would, no doubt[,] have modified his action had their statements proved persuasive." [citation omitted] Groppi counsels that before an attorney is finally adjudicated in contempt and sentenced after trial for conduct during trial, he should have reasonable notice of the specific charges and opportunity to be heard in his own behalf. This is not to say, however, that a full-scale trial is appropriate. Usually, the events have occurred before the judge's own eyes, and a reporter's transcript is available. But the contemnor might at least urge, for example, that the behavior at issue was not contempt but the acceptable conduct of an attorney representing his client; or, he might present matters in mitigation or otherwise attempt to make amends with the court.

*Taylor, supra* at 498–99, 94 S.Ct. at 2703.

In reversing the trial court's contempt citation in *Taylor*, the Court found that the

requisite opportunity to be heard had not been afforded counsel there, and it certainly was not, *see*, 418 U.S. at 491, 94 S.Ct. at 2699 and 41 L.Ed.2d at 904. But the Court emphasized at 418 U.S. at 500 n. 9, 94 S.Ct. at 2704 n. 9, and 41 L.Ed.2d 908, that it was not rejecting the teaching of *Sacher*, as Justice Rehnquist in a dissent had argued.[4]

Certainly the notice and opportunity to be heard which was afforded to the respondent at the original contempt hearing, without even considering the post-hearing matters we are here addressing, exceeded that which the Court in *Taylor* agreed was sufficient in *Sacher*. *See*, p. 24, *supra*.

### F.

■ As to the respondent's contention here and in *Local 542* that the trial judge should recuse because he assumed an adversary attitude toward the respondent that disqualified the court from adjudicating the contempt, the court in *Local 542* held that "[a] judge who objectively expresses his antipathy toward contumacious conduct does not thereby disqualify himself from adjudicating the contempt under Rule 42(a)." *Local 542, supra* at 514.

In this case the respondent makes only a vague reference to the "anger" of the court, and he cites to no instance where the court became personally embroiled with the respondent or where it treated him other than professionally and with courtesy. The cases cited by the respondent as exam-

ples of appropriate recusal situations clearly are not apposite. *In re Dellinger*, 461 F.2d 389 (7th Cir.1972); *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); *Offutt v. United States*, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954); *Peckham v. United States*, 210 F.2d 693 (D.C.Cir.1953). These cases all involve extraordinary situations where counsel made personal attacks on the trial judge (*Mayberry* and *Dellinger*) and where counsel and the court constantly engaged in wrangling (*Offutt*). Respondent does not even suggest that any such matter occurred in the instant case.

If respondent is contending that the occurrences on September 20 and the court's subsequent citation of the respondent for contempt in and of themselves are indications of the court's "anger", similar reasoning also was rejected by the court in *Local 542, supra* at p. 514. *See also, Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964).[5]

### G.

■ Respondent next contends that he was entitled to notice and an opportunity to respond and to prepare for a hearing and trial. But the cases of *Gordon v. United States*, 592 F.2d 1215 (1st Cir.), *cert. denied*, 441 U.S. 912, 99 S.Ct. 2011, 60 L.Ed.2d 384 (1979), *Local 542* and *Sacher* and others cited by the United States Su-

---

4. Justice Rehnquist's dissent appears in *Codispoti v. Pennsylvania*, 418 U.S. 506, 524, 94 S.Ct. 2687, 2707, 41 L.Ed.2d 912 (1974).

5. The court expressed its attitude in the presence of respondent and the other defense and government counsel at the conclusion of the contempt proceedings when it addressed the jury in part as follows:

Members of the jury, I have imposed upon you to have you remain here throughout the proceeding, because you were part of this proceeding, and you witnessed what occurred in court, and it was only fair for you to understand that the Court is obliged to enforce its authority. The system cannot operate otherwise. This is not a personal matter between me and Mr. Renfroe. If it were, perhaps I would turn the other cheek; but it is not my cheek to turn. It is the institution that is involved. It is nothing personal be-

tween me and Mr. Renfroe. I don't feel any personal animosity toward him, but I believe that, clearly, he overstepped the bounds of propriety,....

These are obligations which the Court has to police the conduct of the members of the Bar. The public has a right and is inclined, I think, to judge institutions by the conduct of their members which they condone, and, too often, institutions and professions are judged by the least common denominator. The legal profession is an honorable profession, and the continued respect of the public for those in practice in the courts is essential to the administration of justice, so, when an attorney oversteps the bounds of the canons of ethics that apply in Pennsylvania and which have been adopted by our Circuit, it is the obligation of the Court to take notice of that. (Transcript, Misc. No. 12413, September 20, 1985, p. 16, L. 22 to p. 18, L. 7.

preme Court in *United States v. Barnett,* 376 U.S. 681, 694–95 n. 12, 84 S.Ct. 984, 991–92 n. 12, 12 L.Ed.2d 23 (1964), all indicate that where the contempt was committed in the presence of the court, the defendant is entitled only to minimal notice and opportunity to be heard. Here, Mr. Renfroe was given much more than that. He was provided with a written copy of the contempt citation and an opportunity to read it. After the court stated on the record its bases for the citation, respondent was afforded the opportunity to reply in defense and in mitigation of sentence. Moreover, the court stayed the execution of the sentence and allowed respondent two weeks to obtain counsel and to petition for reconsideration. And, of course, respondent did engage counsel who filed and briefed several motions to reconsider, after which two hours of oral argument and additional allocution in mitigation were had.

We have demonstrated that the procedure which we employed is permissible and sanctioned by the law and cite *Local 542, supra,* and *Sacher, supra,* and the opinion of Judge Augustus N. Hand in the Second Circuit opinion in *United States v. Sacher,* 182 F.2d 416, 428–30 (2nd Cir.1950). In addition to those authorities, in *Barnett, supra* 376 U.S. at 694–95 n. 12, 84 S.Ct. at 991–92 n. 12, the Supreme Court cited 50 cases in that Court which supported summary imposition of contempt.

In addition to that substantial authority, the unique circumstances present in this case made it imperative that the flouting of the court's orders and rulings be dealt with *on the spot.* The trial was highly publicized, and throughout its three-week length representatives of all the local and virtually all of the national radio and television networks along with journalists from numerous news services and local and national newspapers and magazines were present in court. They along with other members of the public were in attendance on Wednesday afternoon, September 18, 1985, when the court and counsel discussed at length the immunity question and the court made its rulings thereon. They and other members of the public, and, of course, the jury, literally filled the courtroom, during clos-

ing arguments when time and again respondent made improper appeals to the jury in blatant and direct violation of the clear and direct orders of the court.

Had the court not cited Mr. Renfroe publicly and on the spot before this very assembly, it is inevitable that the court and the judicial system would have been perceived as indulgent in the lowest levels of legal advocacy. *See, In Re Gustafson,* 619 F.2d 1354, 1362 (9th Cir.1980) (Wright, J., dissenting), *withdrawn, In Re Gustafson,* 650 F.2d 1017, 1022–23 (9th Cir.1981). The affront to the dignity of the court and the integrity of the judicial system was made before that assembly. It was essential that the response to that affront be made before the same group. Had the court not acted promptly, it is fair to say that the jurors and the public would have been left with the inescapable impression that the respondent's conduct, while perhaps not endorsed by the court, was not condemned by it either and that the system was too impotent to redress even the most serious affront to its authority. The respect and confidence of the public in the judicial system, which is essential to the effective administration of justice would have been severely eroded.

In any event, notwithstanding the engagement of counsel, the filing of a brief, and subsequent oral argument, counsel has failed to raise a single argument or authority that indicates that the court erred in its original citation for contempt. Moreover, the record indicates that at no time did the respondent or his counsel ask for an opportunity to produce evidence or make any reference to evidence that would suggest that the court had misapprehended the thrust of the respondent's argument on September 20, or had in any way misapplied the law.

Indeed, the contrary is the fact. Several weeks after he was held in contempt, respondent cited to the court *United States v. Cheung Kin Ping,* 555 F.2d 1069 (2d Cir.1977), in support of the proposition that this court erred when it refused to permit respondent to argue in his summation in

the *Strong* case that the jury should be permitted to find through their verdict that the government improperly immunized certain individuals and prosecuted the defendant. However, not only does the *Cheung* case not support the cited proposition, it is as strong an authority contra to it as one is likely to find.

The facts in *Cheung* are remarkably similar to those in the instant case. Counsel in *Cheung* argued (though certainly not with the permission of the court) that the jury had a " 'right to say by your verdict to the government, we don't want you to make deals with a man like Yuin.' " *Cheung, supra* at 1073. Yuin, an accomplice of the defendant, had been granted immunity by the court on application of the government and used by it as a witness, and the defense counsel there was employing the same strategy employed by Mr. Renfroe in this case; namely, to attempt to persuade the jury to return a verdict of not guilty as an expression of its disapproval of the government's use of immunity to choose its witnesses and defendants.

In his charge to the jury, Judge Brieant, the trial judge, sought to neutralize the improper argument made by counsel for *Cheung.* According to the Second Circuit at page 1073 of its opinion:

He instructed the jury that law enforcement policy was not its concern, and he admonished the jury to focus its attention on the real issue, namely, whether the government had proved the facts alleged in the indictment beyond a reasonable doubt. "[I]f ... you want to send a message to the powers that be" the trial judge explained, "then when the case is over write to your congressman, but don't let that desire to send any message affect you in the meantime in the performance of your sworn duty."

Of course, our charge, *supra* p. 1539, is practically identical to Judge Brieant's. When Cheung's attorney objected to that instruction, the trial court responded that "a common law court still has the right to spear a red herring." On appeal the Second Circuit affirmed, referring to Judge Brieant's instructions, it stated at pages 1073 and 1074:

Indeed, his remarks were well chosen, accurate and appropriate, given the nature of counsel's summation. Counsel had urged the jury to acquit Cheung on the basis of extraneous public policy considerations. In the face of such an argument Judge Brieant would have been remiss if he had failed to redirect the focus of the jury toward the issues of credibility and bias which arise when the government has given special treatment to a cooperating witness and toward the central issue of whether the government had proved its case. The trial court does indeed have the right to "spear a red herring," and in doing so Judge Brieant can hardly be said to have committed error. *See Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, [2555] 45 L.Ed.2d 593 (1975).

### H.

Respondent argues that the proceedings had terminated with the verdict and therefore the need to summarily deter future misconduct of counsel in the case had passed. The short answer to that is that the proceedings, and counsel's business with the court, certainly were not over with the return of the verdict. There remained very important matters to be disposed of, including the bail revocation hearing which was scheduled for the following Monday, possible post-trial motions, and, of course, the sentence which was to follow approximately a month after the verdict. The need remained, therefore, if indeed it be a *sine qua non* of summary contempt under Rule 42(a), of asserting the authority of the court and discouraging likely misconduct in the future. *See, Jessup v. Clark,* 490 F.2d 1068 (3d Cir.1973) at pp. 1071–72.

### I.

■ Petitioner contends that he was denied due process because he was not adequately warned that his behavior was contemptuous. First, as pointed out in *Local 542,* experienced counsel need not be

warned specifically that his violation of a direct order of court will be deemed contemptuous. Experienced counsel is presumed to know that. Mr. Renfroe was advised on Wednesday, the 18th, that the argument which he intended to make was improper and was prohibited by the court. Thus, he was under a direct and specific order not to make the argument.

■ He again was put on notice that his conduct was improper when he made his first excursion into the forbidden area, because prompt objection was made by the government and sustained by the court. After additional probes and additional objections were sustained, he was further placed on notice that his argument was improper by the corrective instructions of the court to the jury. Moreover, after he was told at a side bar conference that his conduct was "virtually contemptuous" and that the only reason the court was not then and there holding him in contempt was because the court did not want at that late date to risk a mistrial, he made his most flagrant attempt to induce the jury to return a verdict based on improper considerations, when he made his "sending them a message" argument to the jury. P. 13, *supra.*

In addition, on several occasions during the trial Mr. Renfroe was warned that disobedience of direct orders could lead to sanctions including contempt. *See* V. 3, pp. 176, 203; V. 4, pp. 2–9, 13; V. 8, pp. 10–11; V. 9, pp. 5–6.

### J.

■ Respondent argues that the sentence was unduly harsh and therefore cruel and unusual. However, the sentence was moderate in view of the fact that his conduct was not only contemptuous but was an attempt to subvert justice.

It is fair to say that Mr. Renfroe knew quite well what he was doing. The evidence in the case against his client was substantial. The testimony of the witnesses who stated that they had dealt with his client and purchased cocaine from him was persuasive, weighty, and was corroborated by testimony and documents verifying the defendant's presence at specific hotels in Pittsburgh at the times when he was alleged to have sold cocaine to ballplayers here.

It appeared at trial that Mr. Renfroe's strategy was to divert the jury's attention from the proper issues before it involving his client and to try instead the baseball industry and the government.

It is quite apparent from several matters which occurred during and after the trial, that, notwithstanding the court's orders to the contrary, respondent intended to attempt to persuade the jury to return a verdict based on its disapproval of the government's immunity policy. At a side bar conference held during the government's rebuttal summation at V. 13, p. 103, Mr. Green, associate defense counsel, indicated to the court that "in light of the two instances in which there have been objections raised relative to immunity when that question was argued by Mr. Renfroe, and then, on rebuttal, when that question was argued by Mr. Johnson, we are requesting that the court give an instruction on jury nullification,—... that the law is that only the jury has the right to nullify; neither side can comment on that particular area, which is the jury nullification, and simply resolve any question—." Upon being pressed by the court for clarification, Mr. Green indicated that the jury should be told that only the jury could make a determination in its deliberations as to "[t]he reasonableness of the immunity." The court declined to give the requested instruction.

Subsequently, in his brief in support of his petition for reconsideration, counsel for the respondent argued in support of the right of Mr. Renfroe to make the type of argument which he had made and which had been prohibited by the court, that Mr. Renfroe really was arguing credibility or the impact of immunity on credibility. But even if he was not, respondent contends:

Even so, there is a certain legal tradition in the United States that respects and allows for a quasi nullification argument. The *tradition* began in the *Zwenger* (sic) [*Zenger*] case in New York

when *Andrew Hamilton argued repeatedly to the jury to disregard the Judge's instructions.* Obviously, I am not seriously arguing a pure nullification argument is permissible, but I am suggesting the issuance and grant of immunity might have been the appropriate subject of discussion by Mr. Renfroe, at least in the context of raising questions to credibility where more famous individuals were given immunity while less famous were not. (emphasis supplied).

Of course, jury nullification is precisely what this court properly was attempting to prevent when it ordered that counsel not argue that the jury might reflect in its verdict its approval or disapproval of the government's immunity policy. It was not for the jury to nullify the law, ignore the instructions of the court and arrive at a verdict based on the jury's concept of what the law should be.

The Peter Zenger case referred to by counsel is, indeed, a venerable case in American history and jurisprudence. Peter Zenger was charged with the criminal libel of the colonial governor of New York. The case was tried in 1735 in New York while we were still under the colonial rule of England. Since truth was not a defense under the existing law, the trial judge refused the defendant's request that the jury be instructed that they should acquit if they found that Peter Zenger wrote the truth. Nevertheless, Andrew Hamilton, counsel for Zenger, argued that notwithstanding the law the jury should acquit the defendant, because he wrote the truth. The jury acquitted the defendant. New Encyclopedia Britannica, Vol. 5, p. 661 (15th ed. 1985).

Of course, then as now, the not guilty verdict of a jury was for all practical purposes final, and even where the verdict was clearly contrary to the facts and law and was induced by the improper conduct of the defense attorney, it was essentially unreviewable. This was recognized recently by the Supreme Court in the *Young* case, *supra,* where it stated at 84 L.Ed.2d 8 n. 6: "Of course, when defense counsel employs tactics which would be reversible error if

used by a prosecutor, the result may be an unreviewable acquittal."

In the *Zenger* case the jury in effect nullified the law. And for years thereafter jury nullification was permitted or at least indulged, by the courts. In 1985, however, the Supreme Court in *Sparf and Hansen v. United States,* 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895), finally outlawed the practice of permitting counsel to argue to a jury that it could return a verdict contrary to the law, and established the now familiar rule that juries are obliged to follow the law as given by the court. At page 101, 15 S.Ct. at page 293 the Court stated part of its reasons:

Public and private safety alike would be in peril, if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court and become a law unto themselves. Under such a system, the principal function of the judge would be to preside and keep order while jurymen, untrained in the law, would determine questions affecting life, liberty, or property according to such legal principles as in their judgment were applicable to the particular case being tried.

The Court at page 102, 15 S.Ct. at page 293 went on to state:

And if it be true that jurors in a criminal case are under no legal obligation to take the law from the court, and may determine for themselves what the law is, it necessarily results that counsel for the accused may, of right, in the presence of both court and jury, contend that what the court declares to be the law applicable to the case in hand is not the law, and, in support of his contention, read to the jury the reports of adjudged cases and the views of elementary writers.

The Court at pages 102–03, 15 S.Ct. at page 293 then ruled:

We cannot give our sanction to any rule that will lead to such a result. We must hold firmly to the doctrine that in the courts of the United States it is the duty of juries in criminal cases to take the law from the court and apply that law to the

facts as they find them to be from the evidence. Upon the court rests the responsibility of declaring the law; upon the jury, the responsibility of applying the law so declared to the facts as they, upon their conscience, believe them to be. Under any other system, the courts, although established in order to declare the law, would for every practical purpose be eliminated from our system of government as instrumentalities devised for the protection equally of society and of individuals in their essential rights. When that occurs our government will cease to be a government of laws, and become a government of men. Liberty regulated by law is the underlying principle of our institutions.

This remains the law to this day, but it is vulnerable. For example, in *United States v. Desmond*, 670 F.2d 414 (3d Cir.1982), Judge Weis points out:

Even though *Sparf* resolved the controversy as to the duty of jurors in federal criminal trials, [footnote omitted] the power to acquit in derogation of that obligation remained—because there could be no punishment for such conduct. . . .

Yet, when defendants have asked that jurors be instructed on their power of nullification, the requests have been denied. (citations omitted).

*Desmond*, at 417.

Earlier, Judge, now Chief Judge, Aldisert in *United States v. Wooton*, 518 F.2d 943 (3d Cir.), *cert. denied*, 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975), speaking for the Court in a different context stated that:

In the division of responsibilities between judge and jury, the jurors have no prerogative to question in the slightest degree the law to be applied to an issue, as announced by the court in its instructions. Indeed, the jurors each swear to render a "true verdict" "according to the evidence and the law as given you by the Court". (footnote omitted).

*Wooton*, at 946.

Notwithstanding this, Mr. Renfroe obviously aware that acquittal by the jury would be unreviewable and therefore, final, for his client, attempted to achieve that result by persuading the jury to disregard the instructions which respondent had advance notice the court would give to the jury.

It was for this reason that the court at side bar, characterized respondent's conduct as "reprehensible," for it was indeed an attempt to obstruct justice and subvert the judicial process. *See*, p. 1540 *supra*. The zeal which an attorney owes to his client in no way justifies that tactic. We quoted earlier at p. 1537, *supra*, from *United States v. Young, supra* at n. 7, quoting the ABA Standards for Criminal Justice 4–7.8 (2d ed. 1980):

"(d) A lawyer should refrain from argument which would divert the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions of the consequences of the jury's verdict."

Mr. Renfroe ignored both admonitions, since he not only attempted to have the jury return a verdict on an improper basis, but he also made predictions as to what the contrary outcome of the case would be, to wit, the jury would be condoning the use of cocaine by baseball players and would be sending his client to jail.

The Circuit in *Local 542* affirmed a thirty-day jail sentence for conduct which in our judgment constituted far less danger or threat to the administration of justice than that of respondent here. In the *Local 542* case, the contempt consisted solely of the refusal per se to obey the orders of the court. The respondent's conduct here was far more serious since it not only had the ingredient of disobedience present in the *Local 542* case, but also had the additional element of a specific attempt to subvert the judicial process and produce a miscarriage of justice. *See*, statement of Court in *Local 542* at p. 1542, *supra*.

The respondent received due process, the holding of contempt was proper and the

sentence reasonable. The petitions to reconsider will be denied.